**In the Matter of EDC, INCORPORATED, et al., Debtors–Appellants.**

No. 89–2431.

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1991.

Decided May 1, 1991.

Philip S. Beck, Chaim T. Kiffel, David J. Zott, Donald G. Kempf, Jr., David M. Elston, Kirkland & Ellis, Robert W. Booth, Chicago, Ill., for International Harvester Co.

Ann M. Hamilton, Philip S. Beck, Chaim T. Kiffel, Donald G. Kempf, Jr., David M. Elston, Kirkland & Ellis, Chicago, Ill., for Navistar Intern. Transp. Corp.

Richard N. Golding, Lord, Bissell & Brook, Constantine L. Trela, Howard J. Trienens, Thomas W. Merrill, Jonathan K. Baum, Sidley & Austin, John P. Crowley, Matthew F. Kennelly, Cotsirilos, Stephenson, Tighe & Streicker, Lee A. Watson, Steven L. Bashwiner, C. Elizabeth McCarty, Mary Ellen Hennessy, Helen C. Lucas, Katten, Muchin & Zavis, Malcolm M. Gaynor, David P. Leibowitz, Schwartz, Cooper, Kolb & Gaynor, Thomas H. Geoghegan, Leon M. Despres, Despres, Schwartz & Geoghegan, Lawrence Fisher, Paul Homer, Friedman & Koven, Chicago, Ill., for debtors-appellants.

Leonard A. Grossman, Dept. of Labor, Chicago, Ill., Carol Connor Flowe, Israel Goldowitz, Melinda Tell Lazare, Pension Ben. Guar. Corp., Legal Dept., George R. Clark, William O. Bittman, Reed, Smith, Shaw & McClay, Washington, D.C., for Pension Ben. Guar. Corp. amicus curiae.

Before POSNER, FLAUM, and KANNE, Circuit Judges.

POSNER, Circuit Judge.

Debtors in possession, representing the unsecured creditors of a group of bankrupt affiliated corporations (collectively, EDC), charge the International Harvester Company (now called Navistar) with mail and wire fraud, 18 U.S.C. §§ 1341 and 1343, as predicate offenses under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962, 1964. Damages in excess of $100 million before trebling are sought. The plaintiffs also seek to subordinate or extinguish tens of millions of dollars' worth of Harvester's claims against the bankrupt estate. After a bench trial, the district judge gave judgment for Harvester on all of EDC's claims.

We must of course construe the facts as favorably to the district judge's findings as the record permits, and when this is done the case does not reveal fraud. The story, much abbreviated, begins in the middle 1970s. International Harvester, then a major manufacturer of combines and other heavy farm equipment, as well as of trucks (its present business), owned, and was the principal customer of, a fully integrated steel manufacturer called Wisconsin Steel Company. Wisconsin Steel was not highly profitable, and Harvester decided to get rid of it. It wanted to divest itself of Wisconsin Steel's liabilities as well, which were liabilities of Harvester because Wisconsin Steel was not a subsidiary of Harvester but merely a division. Foremost among these liabilities were more than $86 million in vested pension benefits of Wisconsin Steel's workers. One choice for Harvester was simply to liquidate Wisconsin Steel, but then it would be stuck with the pension liability. Another choice was to find a buyer for the division. After discussions with the staff of the Pension Benefit Guaranty Corporation, which pursuant to the Employee Retirement Income Security Act (ERISA) guarantees vested pension rights,

29 U.S.C. §§ 1321 *et seq.; Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 361 n. 1, 100 S.Ct. 1723, 1726 n. 1, 64 L.Ed.2d 354 (1980), Harvester decided that if it sold the division and the buyer survived for at least five years it probably would not be liable for any pension benefits even if the buyer could not pay them. This expectation made sale preferable to liquidation, or to a massive capital infusion designed to make the division profitable; so Harvester set about to find a buyer. At first it had no success at all. But eventually—after a sale to a large steel company fell through at the last minute—it chanced upon Envirodyne Industries, a small but rapidly growing company specializing in pollution-control technology. Envirodyne had no experience in the steel industry, and a net worth of only $4 million, yet it offered to buy Wisconsin Steel for $65 million plus assumption of all of Wisconsin Steel's liabilities, which amounted to some $100 million, including the pension liability. The deal closed in 1977.

How was it possible for a minnow to swallow a whale like this? By a leveraged buyout, a device Envirodyne had exploited successfully in the past. Envirodyne pledged the assets of Wisconsin Steel to the lenders who advanced it the money necessary for the purchase. A major lender was Harvester itself, which accepted a note for $50 million rather than insisting on receiving the full $65 million purchase price in cash. Everyone recognized that the purchase was a gamble. Envirodyne was small and had no experience in the steel industry. Wisconsin Steel had been on the block for months without attracting a buyer; it needed a massive injection of new capital to have a hope of prospering; it had huge liabilities. Harvester, to minimize the risk to itself that Envirodyne would default on the $50 million note, took back a security interest in Wisconsin Steel's coal and iron mines, its most valuable properties. Envirodyne, to minimize its own risk, created several new subsidiaries (which for simplicity's sake we are treating as one, EDC) to own the assets—and liabilities— that it was acquiring from Harvester. Envirodyne hoped that the principle of limited liability would shield it from liability should it fail to make a go of Wisconsin Steel. It failed.

At first, it is true, things went well. New management brought in by EDC cut costs, increased sales, hence raised profits. But from the start, management realized that it could not make a success of the acquisition without a substantial investment in rehabilitating Wisconsin Steel's aging plant. It needed $80 million. At first it sought it in the private capital market, but late in 1977 the federal government announced a program of loan guarantees for troubled steel companies, to be administered by the Commerce Department's Economic Development Administration. Because the interest rate on such a loan would be lower than could be obtained in the private market, and because EDC received encouragement from officials of the Economic Development Administration, the company bent all its efforts to obtaining the guarantee. It did so—but too late. By the time the loan closed in 1979, the steel plant, notwithstanding additional loans from Harvester totaling $50 million, had deteriorated irrevocably. The economic downturn that began in 1979 did not help. Nor a protracted strike at Harvester, EDC's biggest customer. In 1980 Harvester and other major creditors called their loans, precipitating the bankruptcy out of which this appeal arises. Envirodyne itself recovered quickly from the disaster, the attempt to cordon off EDC's liabilities having worked—at least thus far, for there still are suits pending against Envirodyne by creditors of EDC, seeking to pierce the corporate veil—and went on to become a Fortune 500 company. The Pension Benefit Guaranty Corporation sued Harvester to make good on the pension liability on which EDC had defaulted when it went broke, and won a judgment before the same district judge. That judgment is not ripe for appeal, however, because the exact amount of Harvester's liability has not yet been fixed.

The plaintiffs' theory of fraud is intricate. It is that Harvester conspired with Envirodyne to create a stillborn entity,

EDC, which would, however—artificially maintained by cash infusions from Harvester—emit signs of life for long enough to dissuade the Pension Benefit Guaranty Corporation from reimposing on Harvester the liability for vested pension benefits that EDC assumed as part of the transaction creating it. The primary victim of such a scheme would be, of course, the Pension Benefit Guaranty Corporation itself, which is not one of the plaintiffs in the present suit or represented by them. The plaintiffs represent individuals and firms that extended credit to EDC beginning with its formation in 1977. They include workers who after they ceased being employees of Harvester and became employees of EDC accrued pension rights not fully guaranteed by the Pension Benefit Guaranty Corporation. The plaintiffs claim that EDC's creditors were fooled by the appearance of life that Harvester and Envirodyne imparted to the new company in order to fool the Pension Benefit Guaranty Corporation. What, you may ask, had Envirodyne to gain from the fraud, a fraud that envisaged the total collapse of EDC? The plaintiffs' answer is that Envirodyne received from Harvester some financial benefits, over and above the assets placed in EDC, as part of the transaction and that it had little risk, because EDC was established as a separate subsidiary so that creditors of EDC could not reach the assets of its parent, Envirodyne. The risk was slight rather than zero because venturesome creditors might try (as in fact they have done) to pierce the corporate veil and reach Envirodyne's assets—and might even succeed.

We agree that the creditors have standing to complain about the alleged fraud even though they were not its primary victims—the Pension Benefit Guaranty Corporation was. That is not because this is a case of transferred intent. It is not. If you aim at X and miss and hit Y instead, you are liable in battery to Y. *Alteiri v. Colasso,* 168 Conn. 329, 362 A.2d 798 (1975); *Manning v. Grimsley,* 643 F.2d 20, 22 (1st Cir.1981); *Prosser and Keeton on the Law of Torts* § 8, at pp. 37–39 (W. Page Keeton *et al.* eds., 5th ed. 1984).

That is the doctrine of transferred intent, and it is not limited to battery cases; for a famous example from defamation, see *Jones v. E. Hulton & Co.,* [1909] K.B. 444, aff'd [1910] A.C. 20 (H.L.). But it is not the general rule in fraud cases; the general rule there is that you are liable only to an intended victim. *Prosser and Keeton on the Law of Torts, supra,* § 107, at pp. 743–45. The reason for this limitation, said to be "obvious" although not obvious to us, is "that the class of persons who may conceivably learn of a misstatement and be influenced by it is so enormous that an impossible burden, likely to be out of all proportion to the fault involved, might be cast upon anyone who makes a false assertion." *Id.* at 743. As these "casual bystander[s]," *id.,* and the like could not prove reasonable reliance in any event, perhaps the real reason behind the rule is to cut short the inquiry in a class of cases where reasonable reliance is unlikely.

We need not pursue the question further. One can be an intended victim without being the primary victim. That is this case, and it is different from a case of transferred intent. Suppose you blow up a plane carrying X and Y in order to kill X. If both die in the explosion, you are just as much Y's murderer as X's, not because of the fiction of transferred intent but because you knew that Y (or any other person who might be a passenger on the plane) would die if your plot against X succeeded. *United States v. McAnally,* 666 F.2d 1116, 1119 (7th Cir.1981). It is not a transferred-intent case because nothing went wrong with your plan; it is a case of extreme recklessness, equated to deliberateness. *Duckworth v. Franzen,* 780 F.2d 645, 652–53 (7th Cir.1985). You killed Y for an ulterior motive, it is true, but most murders have ulterior motives.

If the plaintiffs' allegations of fraud be believed, Harvester had to fool EDC's creditors in order to keep EDC going long enough to get the Pension Benefit Guaranty Corporation off Harvester's back. Fooling them was an intended step in the overall scheme and the fact that it was an intermediate step—so that the schemer

would have been happy if those creditors had not been hurt—does not defeat their rights. *United States v. Larson*, 581 F.2d 664, 667 (7th Cir.1978). As Judge Friendly remarked in a case of criminal fraud, the government's "burden was not to show that defendants were wicked men with designs on anyone's purse, ... but that they had certified a statement knowing it to be false." *United States v. Simon*, 425 F.2d 796, 809 (2d Cir.1969). "The fact that the defendant was disinterested, that he had the best of motives, and that he thought he was doing the plaintiff a kindness, will not absolve him from liability, so long as he did in fact intend to mislead." *Prosser and Keeton on the Law of Torts, supra*, § 107, at p. 741 (footnotes omitted). And that is to state the case more strongly for Harvester than the case warrants. It had designs on *someone's* purse (the Pension Benefit Guaranty Corporation's), and it had no altruistic feelings for EDC's other creditors; at best, it was indifferent to their fate.

■ On the other hand we do not agree with the plaintiffs that the district judge's finding that Harvester is liable to the Pension Benefit Guaranty Corporation undermines his finding in favor of Harvester in the present case. He applied a different standard to the Corporation's case: whether Harvester intended to escape liability for pension benefits by selling Wisconsin Steel to EDC, and, whether, regardless of what it intended, it lacked a reasonable basis for believing that EDC could discharge that liability. *In re Consolidated Litigation Concerning International Harvester's Disposition of Wisconsin Steel*, 681 F.Supp. 512, 526 (N.D.Ill.1988). Whether this is the right standard and whether if so it was correctly applied to the facts of the case are not before us. It plainly is not a fraud standard. If Harvester honestly but mistakenly and even unreasonably believed that EDC would survive, thrive, and pay off all the pension benefits that Harvester had tried to shuck by selling Wisconsin Steel, then Harvester would not be guilty of the fraud charged by the plaintiffs in this case, although it would be liable to the Pension Benefit Guaranty Corporation under the standard just described.

■ We move, then, to the central question raised by this appeal, which is whether the district judge committed clear error in finding that Harvester did not intend to create a stillborn entity to which it would impart febrile signs of life for just long enough to beguile the Pension Benefit Guaranty Corporation, at which point the house of cards would be left to collapse. The plaintiffs had the burden of proving this scheme (though only by a preponderance of the evidence, *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1303 (7th Cir.1987)), and they failed to convince the judge. In this court they make fun of his comparison of the chief executive officer of Harvester to Winston Churchill. Churchill famously remarked that he had not been made the King's first minister in order to preside over the liquidation of the British Empire. Brooks McCormick of Harvester convinced Judge Moran that he had not been made the chief executive officer of the company in order to liquidate Wisconsin Steel Company. Wisconsin Steel was not the British Empire, and McCormick was no Churchill. But like Churchill he may have been a stubborn man who sincerely if misguidedly believed that he could revivify a moribund enterprise. That was for Judge Moran to decide. McCormick did not deny that avoiding liability for the vested pension rights was a consideration in the sale to EDC. But he did deny knowing that EDC was doomed to fail. And Judge Moran, who listened to him testify for four days, was entitled to believe him.

Furthermore, there is more to fraud than intent to defraud. These plaintiffs, creditors who extended credit to Wisconsin Steel *after* the sale to EDC (had they extended credit before the sale they would have been creditors of Harvester, because Wisconsin Steel was merely a division, and hence they would be unaffected by EDC's bankruptcy), can complain only of misrepresentations which were made to them and on which they reasonably relied. *AM-PAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035, 1040–42 (7th Cir.1990).

And what were these? That Harvester and Envirodyne hoped to make a go of Wisconsin Steel? But they did so hope, or so at least Judge Moran was entitled to and did find. The creditors knew that a mouse was trying to eat an elephant at one sitting, and might choke. The details of the transaction were not concealed. The risks were palpable. The plaintiffs do not base their claim on any misrepresentations made before or during the creation of EDC and the transfer to it of the assets—and liabilities—of Wisconsin Steel. At bottom the plaintiffs appear to be arguing that merely by lending money to EDC, Harvester was creating the false impression that EDC was a viable entity—for what rational businessman throws good money after bad? Even the premise is dubious: people lend to bankrupt firms, provided the loan is adequately secured; and Harvester insisted on security. But this point to one side, we have trouble seeing how lending money to a company can be bootstrapped into a misrepresentation. It would be like arguing that a bank becomes liable to the creditors of its borrower if the bank loan could be said to misrepresent the borrower's solvency—a theory of lender liability that would go even further than the one we rejected in *Secon Service System, Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406, 419 (7th Cir.1988), where the bank was alleged to have "project[ed] a false impression that [its borrower] would remain solvent." A projection, prediction, or representation is one thing; a loan is quite another. Maybe the plaintiffs have other forms of "misrepresentation" in mind, but as they have failed to comply with the requirement of pleading fraud with specificity (Fed.R. Civ.P. 9(b)), they can hardly expect to benefit from the generality of their charge; indeed their violation of the rule provides an independent ground for affirming Judge Moran's decision. Cf. *id.* at 419.

Perhaps aware in their heart of hearts that the elements of a conventional fraud case are missing—for the plaintiffs do not appeal from the judge's dismissal of their pendent state-law claim for common law fraud—they remind us of the extravagant rhetoric in which some judicial opinions interpreting the federal mail fraud and wire fraud statutes come wrapped. For example, fraud has been said to be whatever is not a "reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *United States v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980); *Gregory v. United States*, 253 F.2d 104, 109 (5th Cir.1958). Such hyperbole, of which we were guilty in *United States v. Serlin*, 538 F.2d 737, 744 (7th Cir.1976), but later repented in *United States v. Dial*, 757 F.2d 163, 170 (7th Cir.1985), and *United States v. Holzer*, 816 F.2d 304, 309 (7th Cir.1987), must be taken with a grain of salt. Read literally it would put federal judges in the business of creating new crimes; federal criminal law would be the nation's moral vanguard. But even taken literally, the "fair play" theory of mail and wire fraud would not compel a judgment for these plaintiffs. The leveraged buyout and the principle of limited liability can, and here did, combine to create a risky venture. But as long as business risks are in the open and are not forced on anyone, it is hard to see why when the risks materialize the persons hurt by them should be permitted to cry "fraud!" American companies are criticized, rightly or wrongly, for being too quick to liquidate unprofitable plants and throw the workers out of their jobs and their communities into turmoil. Harvester gambled on *not* liquidating Wisconsin Steel, which in retrospect would have been the less costly course of action for it to take. It should not be penalized just because the gamble failed. Some of the workers who are now plaintiffs in this suit held on to their jobs for three more years because of the venture that they now label a fraud.

The remaining issues need not detain us long. The plaintiffs' plea for equitable subordination of Harvester's claims against the bankrupt estate is answered by our recent decision in *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir.1990), which holds that the doctrine of equitable subordination may not be used to impose

obligations on parties above what they have agreed to, in the absence of evidence of overreaching not present here. Bankruptcy enforces—it does not create—creditors' entitlements. *In re Lapiana,* 909 F.2d 221, 223 (7th Cir.1990); *Boston & Maine Corp. v. Chicago Pacific Corp.,* 785 F.2d 562, 566 (7th Cir.1986). Setting the issue of fraud to one side, and accepting as we do Judge Moran's finding that Harvester dealt with EDC at arm's length and so did not owe it the duty of a fiduciary, compare *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, supra,* 908 F.2d at 1356, we have a case where Harvester, having lent EDC $100 million (the $50 million initial note plus the later loans for another $50 million) and taken a security interest in certain assets of EDC in order to secure the loans, wanted to enforce its security interest when the loans went into default. It was entitled to do so.

■■■ The last issue relates to an alleged voidable preference or fraudulent conveyance that Harvester obtained from EDC, at the time of EDC's collapse, in the form of a quantity of iron pellets. The plaintiffs argue that the pellets belong to the estate. The judge refused to set aside the transfer, because he found that it was in exchange for new value. 11 U.S.C. §§ 547(c)(1)(A), 548(a)(2)(A). What that new value was requires a bit of explanation. Harvester had, as we said, retained a security interest in the iron mines that EDC acquired when it bought Wisconsin Steel. As part of the transaction Harvester had agreed (we are simplifying the facts here) to guarantee a debt of $6 million that EDC owed another creditor who had a lien on the mines. The debt came due, and EDC asked Harvester for help. Harvester advanced the $6 million and received the pellets in exchange. The plaintiffs' first argument is that since Harvester was the guarantor of EDC's debt, the advance of the $6 million was not fresh value. *In re Bellanca Aircraft Corp.,* 850 F.2d 1275, 1279–81 (8th Cir. 1988), and the other cases cited there, reject the generic argument—that a creditor who pays off another creditor is not contributing new value to the bankrupt—and this is clearly correct. There was a guaranty in *Bellanca, id.* at 1281 n. 12, and if it was a preexisting obligation this would make that case identical to the present one. It may have been a preexisting obligation; but this is not clear from the court's discussion; however, that makes no difference. A payment of cash that gets an importunate secured creditor off the debtor's back is a boon to the debtor even though that creditor may have a right, among his other remedies, to sue the payor. A guarantee is not a substitute for cash, as we made clear in *Kham & Nate's Shoes* by holding that the issuance of a guarantee is not the giving of new value within the meaning of the Bankruptcy Code. 908 F.2d at 1362–63.

But all this is provided that the pellets were worth no more than $6 million, for if they were, the bankrupt estate was depleted by the exchange; and the game in which favored creditors pick up valuable assets of the failing company at distressed prices is just what the voidable preference and fraudulent conveyance provisions of the Bankruptcy Code aim to eradicate. However, although Judge Moran made no specific finding with respect to the dollar value of the pellets, he did find—not clearly erroneously—that the entire package of benefits exceeded the value of the pellets, which while certainly not worthless, as some witnesses testified, may well have been worth less than $6 million at the time. That they have appreciated since is irrelevant.

The propriety of the result could be questioned by supposing that EDC had defaulted on the $6 million debt and the debtor had gone against Harvester on its guarantee and Harvester had paid. Harvester would have acquired by virtue of this payment an unsecured claim of $6 million against EDC. How much would that have been worth? Probably much less than $6 million. Suppose it would have been worth only $600,000. The pellets were probably worth a good deal more, and the difference would be a transfer that improperly placed Harvester ahead of the other creditors. But this ignores the fact that Harvester had no obligation to advance $6 million or any other sum to buy off the importunate

lienor. It could have sat back and waited to be sued on its guarantee. Who knows what it would have had to pay in the end? Maybe much less than $6 million.

■ We need not pursue the issue further. Judge Moran found in the alternative, not clearly erroneously, that Harvester would have ended up with the pellets anyway because it held the senior lien on the mining interests and they included the pellets.

We find no reversible errors. The judgment is therefore

AFFIRMED.