**Frank LUMPKIN, et al., Plaintiffs.**

v.

**ENVIRODYNE INDUSTRIES, INC., Defendant.**

**No. 89 C 1330.**

United States District Court, N.D. Illinois, E.D.

Oct. 4, 1993.

---

Leon M. Despres, Thomas Howard Geoghegan, Sarah Vanderwicken, Despres Schwartz & Geoghegan, Thomas Edward Johnson, Leslie Ann Jones, Johnson, Schaaf, Jones & Snelling, Chicago, IL, for plaintiffs.

Michael Ives Richardson, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for defendant.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

In 1977 International Harvester (Navistar) sold its Wisconsin Steel Division to subsidiaries of Envirodyne Industries, Inc. (Envirodyne), those subsidiaries being EDC Holding Company (EDC) and its wholly-owned subsidiary, WSC Corporation. (We shall hereafter, for convenience, refer to those subsidiaries, and the other subsidiaries through which the enterprise operated, collectively, as WSC.) WSC went into bankruptcy in 1980, leaving in its wake both tragedy and litigation.

The litigation stemmed from a number of claims and led to a number of lawsuits. The debtors-in-possession, representing the unsecured creditors of the bankrupt subsidiaries, sued Navistar, charging fraud. Many of the employees, most of whom had been employed by Navistar and then by WSC, were entitled to pensions and other benefits under ERISA coverage. WSC had assumed Navistar's liability for those pensions and benefits, and more pension liability accrued during the period WSC operated the enterprise. WSC could not pay those pensions and benefits. The Pension Benefit Guaranty Corporation (PBGC) accepted the obligation to pay the basic pension package accrued up to the closing. It sued Navistar and Envirodyne for recovery, claiming that Navistar could not so easily shed itself of a massive pension obligation and that Envirodyne, as a control group company under Title IV ERISA, was liable up to 30 per cent of its assets. The PBGC did not, however, have an obligation to pay and did not pay all the employee ERISA benefits. The former employees sued Navistar for the benefits not covered by PBGC that had accrued prior to the sale.

The three suits, by the debtors-in-possession, by PBGC and by the employees, were consolidated for trial. PBGC settled with Envirodyne and the former employees settled with Navistar. The PBGC claims against Navistar and the claims of the debtors in possession proceeded to trial. At its conclusion this court ruled that PBGC was entitled to recover from Navistar, in an undetermined amount, for pension obligations arising prior to the sale for which PBGC had liability, and that the debtors-in-possession were not entitled to recover. PBGC and Navistar ultimately agreed on the form and amount of recovery. The debtors-in-possession appealed, and the judgment was affirmed in *Matter of EDC, Inc.,* 930 F.2d 1275 (7th Cir.1991).

That left open one claim. The former employees had filed a lawsuit against Envirodyne shortly after their settlement with Navistar, seeking recovery of the pension obligations and other benefits primarily accruing after the sale and before the bankruptcy and not satisfied by PBGC. Envirodyne had undergone a metamorphosis. It was not worth much when PBGC first sought recovery of ERISA statutory liability. It had thereafter blossomed into a very successful company. This court dismissed the former employees' suit, which was predicated on piercing the corporate veil since they had been employed by the subsidiaries, not Envirodyne. The dismissal was grounded on this court's conclusion that the claim was barred by the release executed in the Navistar suit, which included the subsidiaries. The Court of Appeals disagreed and remanded for trial, *Lumpkin v. Envirodyne Industries, Inc.,* 933 F.2d 449 (7th Cir.1991).

Plaintiffs in due course filed a motion for summary judgment. In the meantime the fortunes of Envirodyne had declined. Not long after the motion was fully briefed Envirodyne sought protection in bankruptcy and the case here was subject to an automatic stay. It made sense to all concerned, however, that this court, being more familiar than it wished to be with the history of WSC's demise, should rule upon the motion for summary judgment, and the reference was withdrawn for that purpose. That consideration has taken longer than anticipated—the recapture of the mass of information relevant to a ruling has not been an undertaking possibly accomplished in a stray hour, here and there. We have now completed that undertaking and we must, unfortunately, deny the motion.

The motion does not falter on the disputed ambit of the release. The Court of Appeals has concluded that it is ambiguous; that a party releases only those he intends to release; and that a determination of the parties' intent requires a more developed evidentiary record, including extrinsic evidence, although "in all probability Envirodyne has not been released by the Settlement Agreement...." *Lumpkin,* 933 F.2d at 462. And, certainly, extrinsic evidence can lead to an interpretation of the scope of a release as a matter of law. *Air Line Stewards and Stewardesses Ass'n v. American Airlines, Inc.,* 763 F.2d 875, 878 (7th Cir.1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). Plaintiffs claim there is no extrinsic evidence that they intended to release Envirodyne and, indeed, the only extrinsic evidence is that plaintiffs' counsel, shortly after the settlement, disclaimed any intention of releasing that company.

A settlement agreement is a contract; an unexpressed subjective intent is trumped by contrary representations or conduct, and a later expression of subjective intent cannot prevail in the face of prior contrary representations or conduct. But here it is apparently undisputed that the potential liability of Envirodyne, not named in the release, was never discussed by plaintiff and Navistar prior to the settlement. Although Navistar later took the position that Envirodyne had been released, it did so in the context of a threatened action against it by Envirodyne and the prospects of this suit, in which it had no wish to become embroiled; it has not provided any basis for its conclusion. That Navistar might become embroiled was enough of a concern to cause plaintiffs on various occasions to seek Navistar's permission to sue Envirodyne or to continue the action and to offer Navistar protection and indemnification. They continued, however, to assert that they never had released Envirodyne. That Envirodyne might sue or that it might bring Navistar into this action does not determine, however, that it could in fact successfully invoke the protections of the release. Given the construct of the Court of Appeals, since Envirodyne was not named in the release and since the direct extrinsic evidence of the parties' intent does not indicate that plaintiffs intended to release Envirodyne, plaintiffs are entitled to summary disposition of the release issue unless the necessary implications of the release dictate otherwise. And the Court of Appeals has determined that they do not. The release is not a bar to this action.

Defendant fares little better with its limitations and laches contentions. It invites us to revisit the limitations issue on the basis of *Lampf, Pleva, Likind, Prupis & Petigrow v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). The Court of Appeals, however, adopted a ten-year ERISA limitations period in *Lumpkin,* and *Lampf, Pleva* does not compel a contrary conclusion. The argument is better addressed to the Court of Appeals should the occasion arise. To the extent that plaintiffs seek non-ERISA benefits here, they are, we believe, governed by the five-year statute and more stringent alter ego concepts. We do not understand their claim to be that expansive.

Assuming that a laches argument is timely or possible in an action for damages controlled by equitable considerations, it is unavailing here. Defendant claims prejudice, but three of its reasons, that the union is defunct, that Envirodyne could have gone into bankruptcy, that perhaps it could have arbitrated the matter (it has never indicated the basis for that contention, and it appears to be without merit), relate to 1980 circumstances, and it can hardly be argued that plaintiffs had an obligation to sue in 1980 or not at all. More importantly, defendant has some difficulty in articulating the evidence of which it has been deprived by the passage of time. And well it should have difficulty. The circumstances were mined to depletion during the exhaustive discovery in the earlier actions. That ore is available. Nor do we understand plaintiffs, in their alter ego claim, to claim that they were unaware that WSC was a highly leveraged enterprise or that they had reason to believe that a non-

contracting company, Envirodyne, was somehow a guarantor. Indeed, the fact that the structure of the enterprise was "in the open" was, as the Court of Appeals noted in *Matter of EDC, Inc.*, 930 F.2d at 1281, a powerful reason for concluding that there was no fraud in the conventional sense.

■ Conversely, we are not persuaded by plaintiffs' invocation of collateral estoppel concepts. The issue, which arose in plaintiffs' reply brief, was thoroughly explored in supplemental memoranda. Plaintiffs' contention is as follows: Envirodyne filed unsecured claims in bankruptcy against WSC, an amount in excess of $500,‑ 000; WSC, as debtor-in-possession, sued Navistar on behalf of the unsecured creditors; Envirodyne was in privity with WSC in advancing that claim; this court found that WSC had "no reasonable chance to succeed"; and Envirodyne is bound by that finding in a suit prosecuted by its representative.

We have no doubt that Envirodyne became bound by that finding in any subsequent effort to prosecute a separate claim as an unsecured creditor against Navistar—as well as the determination that Navistar was not liable for RICO fraud. The result would probably be the same if Envirodyne sued Navistar directly, claiming fraud. *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339 (7th Cir.1987); *In re Medomak Canning*, 922 F.2d 895 (1st Cir.1990); *In re Dominelli*, 820 F.2d 313 (9th Cir.1987). But the prior action was a claim against Navistar. Its conduct, not Envirodyne's, was at issue. The debtor-in-possession was not seeking to defend, nor was Navistar seeking to attack Envirodyne. Envirodyne did not control that lawsuit, although it had a minor direct (and possibly immense indirect) interest in it. Here the plaintiffs seek to use collateral estoppel offensively, to preclude Envirodyne from presenting evidence and arguments in defense of the charges against it. Since Envirodyne has not had a full and fair opportunity to defend itself it cannot now be precluded from doing so. *Pinto Trucking Service, Inc. v. Motor Dispatch,* *Inc.*, 649 F.2d 530 (7th Cir.1981). Envirodyne cannot be said to have had its day in court on the claims in this lawsuit. *In re Gottheiner,* 703 F.2d 1136 (9th Cir.1983).

■ We come then to the central issue of this motion: whether as a matter of law plaintiffs are entitled to pierce the corporate veil and to reach the assets of Envirodyne to satisfy the pension obligations and other ERISA benefits admittedly owing to them by WSC.

Since this is a summary judgment motion we must determine whether, on the basis of the undisputed facts, Envirodyne should be answerable for its subsidiaries' ERISA obligations as a matter of law. The standard we apply is federal and the Court of Appeals in *Lumpkin* noted that "(t)he underlying congressional policy behind ERISA clearly favors the disregard of the corporate entity in cases where employees are denied their pension benefits." 933 F.2d at 461. The court in *Lumpkin* relied on both *Alman v. Danin,* 801 F.2d 1, 3 (1st Cir.1986) ("ERISA … cannot be said to attach great weight to corporate form"), and *Laborers Clean–Up Contract Administration Trust Fund v. Uriarte Clean–Up Service, Inc.,* 736 F.2d 516 (9th Cir. 1984).

In *Uriarte*, the court looked to three factors: the amount of respect given to the separate identity of the corporation by its shareholders, the fraudulent intent of the incorporators, and the degree of injustice visited on the litigants by respecting the corporate identity. Those same factors were relied upon in *Alman*. The First Circuit more recently has described "fraudulent intent" as less than fraud in the criminal or actionable civil sense, but there still must be a showing of moral culpability. *United Electrical, Radio & Machine Workers of America v. 163 Pleasant Street Corp.,* 960 F.2d 1080, 1093 (1st Cir. 1992). It is only when the quest to limit the corporate responsibility evolves into a specific effort to evade a parent corporation's legal obligations that veil-piercing is possible.

Other courts have noted that deference to corporate identity may be particularly inappropriate in ERISA cases because Congress enacted ERISA in part to protect employees who were being deprived of anticipated benefits by corporate shams, *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702 (6th Cir.1988); and that a more relaxed standard is appropriate to effectuate federal statutory policy, *N.L.R.B. v. Fullerton Transfer & Storage, Ltd.*, 910 F.2d 331 (6th Cir.1990); *N.L.R.B. v. Greater Kansas City Roofing*, 2 F.3d 1047 (10th Cir.1993) (where the court used a two-prong standard). The corporate form may be disregarded where used to defeat an overriding federal policy. *Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1111 (9th Cir.1979).

We have no doubt that a more relaxed standard applies here. That conclusion is, however, but the beginning of the problem.

Courts normally treat a corporation as an entity distinct from its shareholders, but they will disregard the corporate form if it is abused. The apparent simplicity of this principle of corporate law belies the problem in actual practice of determining when to 'pierce the corporate veil,' especially in federal question litigation.... Much confusion has resulted, largely because the alter ego doctrine itself and federal common law are both amorphous.

Note, "Piercing the Corporate Law Veil: The Alter Ego Doctrine Under Federal Common Law," 95 Harv.L.Rev. 853 (1982). One court has described the federal decisions as a "jumble." *Seymour*, 605 F.2d at 1111. The issue ultimately is whether or not the corporate form has been so abused, in light of the policies underlying ERISA, that it should be disregarded—a highly fact-intensive inquiry.

Plaintiffs rely on numerous facts and defendants assert additional facts or dispute plaintiffs' implications, or in other ways seek to fend off the thrust of plaintiffs' contentions. The core dispute is over the limited capitalization of the subsidiaries—"... a mouse was trying to eat an elephant...." *Matter of EDC, Inc.*, 930 F.2d at 1281. We leave that issue until later and turn to the other reasons plaintiffs urge upon us to justify piercing the corporate veil. And they need not detain us long.

Plaintiffs point out that loans from a bank and from Envirodyne officers were repaid from the proceeds at closing, that Envirodyne received million dollar management fees and that research by Envirosonics was funded to the tune of $4 million, all upstreaming from the hard-pressed subsidiaries. Defendant counters by contending that the upstreaming was minimal and merited and had nothing to do with the ultimate demise of WSC.. Loans were paid from funds validly transferred to Envirodyne to repay acquisition costs and, with respect to the bank loan, the purpose was to free up assets transferred to the subsidiaries. The subsidiaries got what they paid for in management fees. Envirosonics research was of primary interest to the steel and coal operations. And there was downstreaming as well. Envirodyne transferred $1 million to the subsidiaries, about a third of its net assets. It pledged a prime asset, Envirosonics, to Navistar, and lost it. It ended up paying PBGC $2 million for Title IV liability. Plaintiffs contend that one of the reasons for the multiple subsidiaries was to avoid Title IV liability—Linde said so. Defendant contends that the corporate structure was out in the open. It may have hoped to avoid liability by taking advantage of the way the statute was drafted, but that was avoidance, not evasion, and unsuccessful at that. Title IV liability also concerns obligations not within the ambit of the present claims. Envirodyne contends that it later succeeded in spite of, not because of, the venture into steel production. It devoted time, effort and money into what ended up a losing enterprise—time, effort and money that could have, in hindsight, been better devoted elsewhere.

Plaintiffs contend that their claim is supported by Envirodyne's 100 per cent ownership, some common directors, Linde's involvement in WSC operations, his visit to a union meeting, joint tax returns, and com-

mon offices. Defendant counters by pointing out that most of the matters of which plaintiffs complain are common to most parent-subsidiary relationships and that Linde, an officer and director of one or another of the subsidiaries, had a right to be involved in its management and actually was involved almost exclusively in strategic planning and in fundraising efforts. It asserts that James Morrill, a stranger to Envirodyne, was brought in to manage operations, and that the separate corporate identities were scrupulously observed.

This court's recollection of the evidence of corporate separation in the earlier trial is that it supports Envirodyne's contentions. In any event, however, the benefits and adverse consequences to the parent and the relationship of parent and subsidiaries are sharply disputed, hardly the stuff for summary judgment.

We turn, then, to the capitalization issue.

Undercapitalization has been a significant factor in many veil-piercing cases. It lends itself to analysis as disrespect for the corporate form, as fraudulent intent and as resulting in injustice, and plaintiffs urge that the circumstances here establish each prong. They argue that Linde conceded that the capitalization was thin, that he cannot now contradict his earlier testimony, and that thin capitalization, synonymous with undercapitalization, is alone enough to reach Envirodyne's assets in an ERISA case, particularly in the context of a deliberate effort to dump pension obligations.

We think plaintiffs seek to read too much into a single phrase. "Thinly capitalized" can cover a variety of circumstances and the term is subject to amplification. It may mean that the corporation had neither assets nor working capital as in *Uriarte* and *Alman.* It may mean that the resources devoted to the enterprise were substantial but marginal in light of the magnitude of the undertaking. Plaintiffs argue that the resources were just too marginal and that Envirodyne was all too willing to risk employees' pensions and benefits but not to risk its own assets. Lehman Brothers seriously questioned a transaction in which a favorable outcome was so uncertain and to which Envirodyne was unprepared to commit its own net worth.

Envirodyne contends that the employees have the wrong perspective. It stepped in when no one else would, it had a plan it believed in and that plan almost worked, and Envirodyne saved the jobs of the employees for three years while it tried to make WSC succeed. It did not dump pension liabilities because it never accepted prior Navistar pension liabilities and the subsidiaries assuming those liabilities had not created them. If WSC failed, there could well be a dispute between Navistar and PBGC over who funded the accrued Navistar pension liability but that was not an obligation Envirodyne had ever assumed. By the sale, WSC acquired assets valued at approximately $200 million; an operating production facility; coal properties; interests in mining companies, a railroad and an ore carrier; inventory and receivables valued at $50 million; access to some financing and working capital; and marketable ore pellets. It did not engage in the enterprise with the expectation of failing, but the acquisition was not without risk and the Envirodyne assets were not of a magnitude to make a difference between success or failure. Prudent business judgment dictated that Envirodyne limit its risk so that something could be salvaged if WSC failed.

There is some force to Envirodyne's argument (and, throughout this memorandum and order when we say that plaintiffs or defendant contend or argue or assert, we mean that there is evidence that permits the contention to be made, unless we indicate to the contrary), and it finds echoes in both *Matter of EDC, Inc.* and *163 Pleasant Street Corp.* If Navistar (assuming for the moment that Title IV did not exist) had spun off the Wisconsin Steel Division as a free-standing subsidiary with the resources and liabilities of WSC, we have no doubt that piercing the corporate veil would have been appropriate. It could not so easily shed itself of' its massive ERISA obligations. Envirodyne did not dump pension obligations. The "thin capi-

talization" was out in the open; there was no misleading of creditors in that respect. *See* Posner, "The Rights of Creditors of Affiliated Corporations," 43 U.Chi.L.Rev. 499 (1976). Envirodyne could not itself have made a difference, and its limitation of liability was not necessarily aimed at pension liabilities if WSC failed. Its survival in those circumstances would have depended on fending off obligations from whatever source because its resources would have been quickly exhausted. Limited liability, it can reasonably be argued, was essential if Envirodyne was to sign on to the effort to rescue a moribund company.

There is no dispute, however, that the transaction was a highly leveraged buyout and a gamble—how big a gamble was a matter in dispute at the time and now, just as the assessment of reasons for the failure remain in dispute. Clearly, though, WSC needed massive amounts of additional capital and the prospects of obtaining it were uncertain. It is also somewhat disingenuous to disclaim any responsibility for dumping pension obligations. Envirodyne was well aware that Navistar's opportunity to shed itself of that burden depended on the sale to Envirodyne subsidiaries and their assumption of those obligations, with the attendant risk that they could not make good on them. It was, or had to be, aware that the employees were not in any real sense voluntary creditors. As a practical matter they could not take their services elsewhere, and it is that immobility that has contributed to the tragedy following in the wake of the WSC collapse. The employees are far more akin to involuntary creditors than to vendors who can take their trade elsewhere. *See United States v. Jon–T Chemicals, Inc.*, 768 F.2d 686 (5th Cir.1985). At least some of the Navistar management were concerned about the preservation of jobs; Envirodyne was concerned about ascending to the ranks of a major corporation. And if WSC failed, Envirodyne knew that the benefits earned by the employees and not covered by PBGC would be lost.

We do not reach (because we deny the motion for summary judgment) Envirodyne's argument that it paid its dues when it settled its Title IV liability, and that any liability beyond that for ERISA liabilities not covered by the PBGC would violate congressional intent. We note plaintiffs' observation that defendant should have recognized at least a moral obligation when it was financially able to do so, but we do not think that it is within the province of the court to comment upon it. What we are persuaded of is that, given the moral ambiguities arising in an economic context, we cannot conclude that Envirodyne so abused the corporate form with respect to ERISA obligations that piercing of the veil is mandated as a matter of law. The motion for summary judgment is denied.