Frank LUMPKIN, et al.,
Plaintiffs–Appellants,

v.

ENVIRODYNE INDUSTRIES, INC.,
Defendant–Appellee.

No. 90–1233.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 26, 1990.

Decided May 17, 1991.

Leslie A. Jones, Johnson, Schaaf, Jones & Snelling, Thomas E. Johnson, Thomas H. Geoghegan, Despres, Schwartz & Geoghegan, Chicago, Ill., for plaintiffs-appellants.

Charles B. Wolf, Stanley Block, Michael I. Richardson, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendant-appellee.

Before BAUER, Chief Judge, and CUMMINGS and RIPPLE, Circuit Judges.

CUMMINGS, Circuit Judge.

## I. Background

This case requires us to untangle the legal positions of parties disputing whether former employees of the Wisconsin Steel Division ("Division") should be awarded more than $40 million in lost pension benefits that they earned from 1977–1980. The litigation before us represents but one chapter in a complex cycle of litigation stemming from the sale of a steel plant in 1977.[1] The plaintiff class appeals Judge Moran's grant of Envirodyne's motion to dismiss their case for vested benefits earned between 1977 and 1980. Because this dismissal was granted on the basis of a failure to state a claim, Fed.R.Civ.P. 12(b)(6), we construe the facts on appeal in a light most favorable to the plaintiffs.

International Harvester (its name has since changed to "Navistar" and it will be referred to as such) owned the Division, which included a steel plant located in Chicago, Illinois, the steel mill's inventory and receivables, two iron-ore mines, and a coal mine, for 75 years. In 1977, Navistar concluded that the plant was no longer profitable for the corporation and began to look for a buyer. However, the plant did not come unencumbered. Any prospective buyer of the Division would not only receive a steel plant but also would assume responsibility for over $62 million in unfunded pension liabilities, a considerable amount for any prospective buyer to absorb.

In 1977, Navistar found an unlikely buyer, however, in Envirodyne Industries, Inc., a small engineering company located in Oak Brook, Illinois, interested in purchasing the Division in order to test new environmental technologies. Envirodyne also viewed the Division as serving certain short-term pressing financial needs. Navistar's sale of the Division to Envirodyne was not a straight sale, however, and ultimately the deal took the form of a transfer of title by Navistar to two wholly-owned subsidiaries of Envirodyne, set up specifically for the purpose of assuming control over the Division. The two subsidiaries were named EDC Holding Company ("EDC"), a subsidiary of Envirodyne, and WSC Corporation ("WSC"), in turn a subsidiary of EDC. Under the terms of the sale by Navistar, the two subsidiaries assumed responsibility for the substantial unfunded pension fund of the Division.

This arrangement endured from 1977 until 1980, when EDC and WSC filed for bankruptcy under Chapter 11 of the Bankruptcy Code and the Division closed. The bankruptcy filing was precipitated by Navistar, which foreclosed on the mortgages extended to EDC and WSC as part of the sale of the Wisconsin Steel Division.[2]

The bankruptcy spawned a flurry of litigation, precipitated by the claims brought

---

1. Still pending before this Court are appeals arising out of Judge Moran's decision in *Pension Ben. Guaranty Corp. v. Envirodyne Industries, Inc.*, 10 EBC 1458 (N.D.Ill.1988) that Navistar was held to be liable to the plaintiffs for the employees' pension benefits only to the date of sale. This Court held recently that Navistar was not liable in fraud to EDC. *In re EDC, Inc.*, 930 F.2d 1275 (7th Cir.1991).

2. EDC and WSC could not afford to pay for the Wisconsin Steel Division at once, so that Navistar extended credit to the purchasers in the form of mortgages.

by the creditors of EDC and WSC for the debts due to them. In 1980, the logical defendant was not the parent of the two subsidiaries, Envirodyne, which had yet to grow into the Fortune 500 company which it has now become, but Navistar, for it was Navistar that initiated and leveraged the sale of the Division in the first place to Envirodyne, a buyer that was alleged to be undercapitalized and incapable of assuming sole responsibility for the huge pension fund. Indeed, Lehman Brothers, which had prepared a report reviewing the terms of the ultimate sale of the Division by Navistar to EDC and WSC, stated unequivocally that the deal smelled of fraud, and called for Envirodyne to take responsibility for the pension benefits as opposed to the two subsidiaries, set up presumably to insulate the parent from liability for the pension fund.

A series of claims was subsequently brought against Navistar. First, there were the claims brought by the creditors of EDC and WSC for the debts of the two subsidiaries. Next were two sets of pension claims for the pension monies due to the former employees of the Division for benefits from the period both before and after the sale of the Division. Under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1081 *et seq.*, the employees filed claims for vested pension benefits with the Pension Benefit Guaranty Corporation ("PBGC"), which acknowledged that the claims were insured and proceeded to assume fiscal responsibility for a portion of the claims. PBGC in turn filed suit against Navistar for indemnification for the pension claims it had satisfied. The remaining claim against Navistar was filed by Frank Lumpkin *et al.*, the class of former employees of the Division, who filed claims for the pension and contractual obligations not guaranteed by the PBGC and running from 1977 through 1980.

These three lawsuits were subsequently consolidated by Chief Judge Moran into what became known as *Lumpkin I.* Before trial of these consolidated claims, Navistar settled with the various parties for $14.8 million in February 1988. Contained

in the Settlement Agreement was a release, which has since become crucial to the disposition of the instant case. The release provided that "[t]he Settlement Agreement settles all claims by or on behalf of members of the Settlement Class in the *Lumpkin* class action and in the *WSC* bankruptcy proceedings." The Definitions section of the Settlement Agreement identified the parties included in the Settlement Agreement. They included Navistar, the Lumpkin Class, EDC and WSC. Significantly, however, Envirodyne Industries, Inc. was not named in the Settlement Agreement, and the *Lumpkin* plaintiffs' present claims hinge on a finding that Envirodyne was not released by the terms of the Settlement Agreement. This is a point to which we will return.

One important fact worth noting at the outset is that when the settling parties presented the Settlement Agreement in district court for a fairness hearing by Judge Moran, counsel to the *Lumpkin* class pronounced in open court that the plaintiffs did not intend by the release to absolve Envirodyne of potential liabilities. Plaintiffs' counsel suggested also that it wished to reserve its rights against Envirodyne even though EDC and WSC were named explicitly in the release. At the time of this statement, Judge Moran did not make any explicit ruling on the viability of future claims by plaintiffs against Envirodyne.

Following the Settlement Agreement, the other claims outside the Settlement went to trial. In *Pension Ben. Guaranty Corp. v. Envirodyne Industries, Inc.*, Judge Moran held that Navistar was liable to the PBGC for the employees' pension benefits to the date of the 1977 sale and not after. 10 EBC 1458 (N.D.Ill.1988). The district judge determined further that Navistar had no liability to the debtors-in-possession, EDC and WSC. The decision rejected Envirodyne's claim that Navistar was liable to it for fraud, recognizing that Envirodyne had the necessary information available and was not an "unsophisticated old person relying on some glib-tongued huckster." 10 EBC at 1462. This Court recently affirmed Judge Moran's decision that Navis-

tar was not liable in fraud to EDC. *In re EDC, Inc.*, 930 F.2d 1275 (7th Cir.1991). In that decision, the Court, alluding to cases like this one, acknowledged that "venturesome creditors might try * * * to pierce the corporate veil and reach Envirodyne's assets and might even succeed." *In re EDC, Inc.*, 930 F.2d at 1279. Thus at the time the present litigation began, the plaintiffs had entered into the 1988 Settlement Agreement with Navistar, whose pension liability had been limited as a matter of law to the 1977 sale by Judge Moran's decision in *Pension Ben. Guaranty Corp. v. Envirodyne Industries, Inc.* See note 1 *supra.*

Remaining unrecovered as a result of the proceedings were the pension benefits earned by the plaintiff class from the time that the Division was sold in 1977 to the time that it closed three years later in 1980. In an effort to recover these benefits, the plaintiff class successfully petitioned for recertification for this class action suit against Envirodyne Industries, Inc., the parent corporation of the defunct subsidiaries EDC and WSC. The plaintiffs brought this class action suit under ERISA Section 502 (29 U.S.C. § 1132) and the Labor Management Relations Act ("LMRA") Section 301 (29 U.S.C. § 185) for uninsured pension and contract benefits for the period from the date of sale in 1977 to the date of closure in 1980. The basis for their claim against the parent corporation was that Envirodyne, as parent of EDC and WSC, was liable for the lost benefits under a corporate law *alter ego* theory. In other words, plaintiffs asserted that they should be permitted to disregard the corporate form that would otherwise insulate Envirodyne Industries from plaintiffs' pension claims against EDC and WSC.

As mentioned earlier, Judge Moran, in a memorandum order, certified a plaintiff class identical to the class in *Lumpkin I,* but the plaintiffs' claims did not advance much further because Judge Moran in the same order proceeded to grant Envirodyne's motion to dismiss. The district judge based his decision on several grounds. First and foremost, he concluded that Envirodyne was released under the terms of the Settlement Agreement. Al-

though the Settlement Agreement did not name Envirodyne Industries, there were, in Judge Moran's view, compelling reasons for insulating Envirodyne from liability under the terms of the release. Citing the specific language of the release, he recognized that the Settlement Agreement contained the statement that "all claims" in both the class action and the bankruptcy proceeding were released. According to this reasoning, if *alter ego* claims could have been asserted against Envirodyne in the bankruptcy proceeding, then claims against Envirodyne would be barred under the plain terms of the settlement release. See District Court Memorandum and Order of November 7, 1989, at 9–10 (Plaintiffs' App. A–10—A–11).

Additionally, Judge Moran found a more indirect means of concluding that the Settlement Agreement precluded the plaintiffs' suit against Envirodyne. Since Navistar entered into the Settlement Agreement on the condition that it would be forever released for any further liabilities in the dispute, subsequent litigation in this matter must be reviewed with an eye to its possible effect on the validity of the release. If the suit filed by the *Lumpkin* plaintiffs against Envirodyne could expose Navistar to further liabilities, such a suit would violate the terms of the Settlement Agreement. Judge Moran recognized that the results of the 1988 trial in *Pension Ben. Guaranty Corp. v. Envirodyne Industries, Inc.* made it highly unlikely that Envirodyne, if held liable in a suit by the *Lumpkin* class, could successfully obtain contribution from Navistar. However, he went on to say that "when the bargain was struck [in the Settlement Agreement] the trial had not yet commenced, and the interested parties could not be certain of the outcome." Memorandum and Order of November 7, 1989, at 10 (Plaintiffs' App. A–11). Because he believed the Settlement Agreement cannot be viewed in hindsight, Judge Moran thought that its terms must be taken to include the possibility that Envirodyne would proceed against Navistar, and that the release specifically foreclosed this possibility. *Id.*

Judge Moran concluded that the release prevented the plaintiff class from bringing suit against Envirodyne, and therefore he did not reach the statute of limitations defense put forward by Envirodyne. As an alternative grounds for dismissal, Envirodyne had claimed that the plaintiffs' class action was time-barred by the Illinois five-year statute of limitations for disputes arising on an oral contract. The plaintiff contends in response that the claims here are properly characterized as controversy over the terms of a written contract, so that the longer ten-year statute of limitations applies. If the latter is true, then the plaintiffs' action is not barred by the statute of limitations.

After Judge Moran granted defendant's motion to dismiss, the plaintiffs filed a timely notice of appeal in this Court.[3] On appeal, the plaintiffs asserted that the motion to dismiss was improvidently granted on several grounds, and claimed that as a matter of law the Settlement Release does not immunize Envirodyne from suit. Because the release is assertedly ambiguous on its face, its proper construction hinges on the outcome of a searching examination of the parties' intent. This appeal comes to us on the granting of a motion to dismiss, with an inadequate record for us to decide the question. Therefore, we remand to the district judge to determine the parties' intent on the basis of a more developed evidentiary record. Although Judge Moran declined to reach the statute of limitations issue in the case, both parties briefed it, and we decide it, because the plaintiffs' claims may go forward on the remand. We hold that the proper statute of limitations under Illinois law for the plaintiffs' action is ten years, since the plaintiffs' claims resemble claims on a written contract. Therefore, their claims are not time-barred.

## II. *Analysis*

### A. The Federal Policy Underlying ERISA

Before reviewing the specific legal controversies at issue in the case, it is worthwhile to place this case in perspective. First and foremost, the dispute in this case arose in the shadow of ERISA, the complex, comprehensive federal statute passed by Congress to protect the pension rights of employees. Thus the dispute here arose between one party, the plaintiff employees, whose right to pension benefits has been explicitly protected by Congress in the enactment of a comprehensive legislative scheme, and the defendant, a corporation whose liability for such pension benefits is contested under ERISA and under principles of both contract and corporate law.

■ Whether plaintiffs' claims under ERISA and Section 301 of the LMRA are meritorious is not for us to decide. Our task is limited to a review of Judge Moran's decision to grant the defendant's motion to dismiss. Clearly the plaintiffs have stated a cause of action under both federal statutes. First of all, Section 301 of the LMRA authorizes district courts to decide suits for violation of contracts between an employer and a labor organization, and it is uncontested that plaintiffs were representing all former employees belonging to the Progressive Steel Workers Union or other bargaining units.[4] In turn, ERISA Section 502 provides for civil enforcement, permitting pension plan beneficiaries to bring a private action to recover benefits due to them under the terms of a benefit plan. Specifically, ERISA provides that "[a]n employee benefit plan may sue or be sued under this title as an entity." ERISA Section 502(d)(1), codified at 29 U.S.C. § 1132(d)(1).

**3.** When plaintiffs first filed their notice of appeal, this Court questioned whether the appeal was timely. Upon review of plaintiffs' jurisdictional memorandum, filed in response to our order, we conclude that their appeal was timely filed. The limitations period for filing was tolled from the date of the district court's denial of plaintiffs' motion to reconsider the court's grant of the motion to dismiss. Fed.R.App.P. 4(a)(4)(iii). The district court denied plaintiffs'

motion to reconsider on January 18, 1990. The plaintiffs filed their notice of appeal on January 30, 1990. Plaintiffs had thirty days to file their notice of appeal so that their appeal was timely.

**4.** Envirodyne does not challenge the jurisdiction of the district court under the LMRA or ERISA (Defendant's Br. at 1).

■ The plaintiff class cites other sections of ERISA in support of its claims. Section 203 sets forth the minimum vesting standards for pension benefits. ERISA requires that "[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon attainment of normal retirement age." ERISA Section 203(a), codified at 29 U.S.C. § 1053. Section 204(g) protects accrued benefits from being decreased by amendments to the specific pension plan. ERISA Section 204(g)(1), codified at 29 U.S.C. § 1054. Finally, the plaintiffs refer in their appeal to Section 206(d)(1), ERISA's anti-alienation provision. This section, heavily relied upon by the plaintiffs in their brief and at oral argument, requires that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." ERISA Section 206(d)(1), codified at 29 U.S.C. § 1056(d)(1).

The plaintiffs place particular weight on this last section, the anti-alienation provision, which they believe protects the employees of the Division from either expressly or impliedly waiving their right to pension benefits by entering into the Settlement Agreement. ERISA's anti-alienation provision assertedly protects them from such an unknowing waiver of pension benefits, for the release, if it includes Envirodyne, would operate to deny the plaintiffs their pension benefits for the period after the Division was sold to the subsidiaries of Envirodyne.

■ Plaintiffs' analysis begs the question. The issue is not whether the anti-alienation provision contained in ERISA prevents plaintiffs from waiving their pension benefits. It clearly does not. Rather, the question here is whether the plaintiffs released their claims against Envirodyne by settling their claims with EDC and WSC. Interpreting a settlement agreement presents a question of contract law, in which "[t]he primary object in construing a contract is to give effect to the intention of the parties." *Air Line Stewards and Stewardesses Ass'n v. American Airlines, Inc.*, 763 F.2d 875, 877–878 (7th Cir. 1985), certiorari denied, 474 U.S. 1059, 106

S.Ct. 802, 88 L.Ed.2d 788, citing *Schek v. Chicago Transit Auth.*, 42 Ill.2d 362, 364, 247 N.E.2d 886, 888 (1969). Absent clear language in the Settlement Agreement to resolve a dispute over the proper construction of a contract, a court may go outside the four corners of the contract and consider extrinsic and parol evidence presented by the parties. This requires the district court to then conduct fact-finding so that it may resolve the ambiguities inherent in the contract. *LaSalle Nat'l Bank v. Service Merchandise Co.*, 827 F.2d 74, 78 (7th Cir. 1987).

The former employees of the Division, who comprise the plaintiff class, have no other recourse to recover the pension and welfare benefits due to them from their service to the Division from 1977 to 1980. The anti-alienation provision, while clearly manifesting Congress's intent to protect workers from unknowingly signing away their vested pension benefits, does not impose a bar on settlement agreements wherein pension claims are knowingly and intentionally resolved by employees. *Fair v. International Flavors & Fragrances, Inc.*, 905 F.2d 1114, 1115–1116 (7th Cir. 1990); *Nichol v. Pullman Standard, Inc.*, 889 F.2d 115, 121 (7th Cir.1989). To apply the anti-alienation provision in this case would establish the untenable rule that ERISA prevents plaintiffs from ever entering into a settlement in a dispute over lost pension benefits.

The plaintiffs' position, favoring a rigid application of the anti-alienation provision, is not defensible. They cite the Supreme Court's recent decision in *Guidry v. Sheet Metal Workers Pension Fund*, 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782, for the proposition that "there is *no* exception to this [anti-alienation] policy *ever*." (Plaintiffs' Br. at 19 (emphasis in original)). If this were true, then the Settlement Agreement, in which the plaintiffs plainly recovered a portion of their pension claims, would be invalid so long as any amount of unrecovered pension benefits remained at issue. This no-exception rule, if applied here, would render a Settlement Agreement valid only on the continued approval of the plaintiffs, a result that is surely inconsistent with the whole purpose of en-

couraging settlement agreements to resolve legal claims.

While the anti-alienation provision of ERISA does impose a firm rule preventing pensioners from alienating their benefits, this case is simply outside the realm of the provision. The legal question in this case revolves not around the proper construction of a specific provision in ERISA, but rather around legal questions of corporate and contract law. As the defendant rightly points out, the anti-alienation provision protects individuals who pledge their pension benefits as collateral or squander their benefits before retirement (Defendant's Br. at 20).[5] The Settlement Agreement in this case does not fall into either category. Instead, the question on appeal is whether the employees can recover pension benefits earned between 1977 and 1980 from Envirodyne under the theory that the release in the Settlement Agreement does not extend to Envirodyne and that Envirodyne can be held liable for the pension and welfare benefits under an *alter ego* theory.

B. Application of the Settlement Release to Envirodyne

1. *The intent of the parties*

■■■ Turning to the release itself, the question to be resolved concerns the proper interpretation of a contract entered into by informed parties represented by counsel. Should the release be read broadly to include Envirodyne, even though Envirodyne is nowhere named in the Settlement Agreement? In construing the terms of a contract, a court is required to engage in a two-fold inquiry. First, it is necessary to look to the plain language of the provision at issue. Reviewing Illinois law, this Court has noted that "[t]he starting point must be the contract itself. If the language of the contract unambiguously provides an answer to the question at hand, the inquiry is over." *LaSalle Nat'l Bank v. Service Merchandise Co.*, 827 F.2d 74, 78 (7th Cir. 1987). If the plain language of the contract is ambiguous, then "the court must go on to declare [the contract's] meaning." *Id.* If the court finds that a contract is ambiguous and that extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide. *City of Clinton v. Moffitt*, 812 F.2d 341, 344 (7th Cir.1987). However, if the parties dispute the extrinsic evidence on an ambiguous contract, then a fact-finder must be called upon to determine the intent of the parties. *Id.; LaSalle Nat'l Bank*, 827 F.2d at 78; *Air Line Stewards and Stewardesses Ass'n v. American Airlines, Inc.*, 763 F.2d 875, 878 (7th Cir. 1985).[6]

■■ We hold that as a matter of law the release is ambiguous on its face. Envirodyne is not identified by name as a settling party, and the release, while it names WSC and EDC, nowhere states that naming the subsidiaries operates to release the parent corporation.

Judge Moran declined to examine fully the parties' intent, believing instead that "[t]he issue is not * * * their subjective intent but the necessary implications of the bargain which they made." District Court Memorandum and Order of November 7, 1989, at 9 (Plaintiffs' App. A–10). In effect

---

5. As support for their reading of the anti-alienation provision, the defendant analogizes to an identical provision of the Internal Revenue Code, Section 401(a)(13), which states that the I.R.C. anti-alienation provision applies to arrangements where benefits are "anticipated, assigned (either at law or equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process." Treasury Reg.Sec. 1.401(a)–13(b).

6. This approach has been questioned in *Riley v. American Family Mut. Ins. Co.*, 881 F.2d 368 (7th Cir.1989), where the Court recognized that either federal common law or state contract law might govern the release of rights under Title

VII or other similar federal statutes. *Id.* at 371. The Court in *Riley* concluded that where plaintiffs execute a settlement release on the advice of counsel and absent fraud or duress, they may release their rights under Title VII. *Id.* at 373–374. The critical difference, however, between *Riley* and the case at hand is that the district judge in *Riley* made an explicit finding that the release was unambiguous. See also *Constant v. Continental Tel. Co.*, 745 F.Supp. 1374 (C.D.Ill. 1990) (same analysis applied to Age Discrimination in Employment Act). Here Judge Moran made no specific finding that the release contained in the Settlement Agreement was unambiguous.

the district court tacitly admitted by this statement that the plain language of the release is insufficient to determine Envirodyne's status. However, to draw any conclusions concerning the necessary implications of this bargain requires going beyond the language contained in the writing itself. Therefore it is necessary to define the parties' intent by looking to extrinsic and parol evidence. The record on appeal is insufficient for us to ascertain the parties' intent. This inquiry must properly be carried out by the district court judge, who has the parties and the evidence before him. In *Air Line Stewards and Stewardesses*, this Court decided that although the settlement agreement in a sex discrimination case was ambiguous on its face, it did not provide for retroactive retirement credit for employees upon consideration of extrinsic evidence. The Court declined to remand for findings of fact, concluding that the issues in the case had been fully briefed, and the Court had before it all of the relevant extrinsic evidence. 763 F.2d at 879. We cannot do the same here, because the record is incomplete. The district judge made no findings of fact, and there may well be extrinsic evidence outside the record on appeal that bears upon the proper determination of the parties' intent.

Although this Court cannot make factual findings concerning the intent of the parties from this record, we can examine the legal principles that will apply to the district court's evidentiary inquiry. First, it must be determined under applicable law whether, as plaintiffs contend, a specific intent to release is required for Envirodyne to be released from further liabilities pursuant to the Settlement Agreement. Second, this Court must decide whether Envirodyne is specifically included in the release by virtue of the fact that it is the parent corporation of two corporate entities named explicitly in the release, EDC and WSC.

Envirodyne advances two arguments in support of its position that the Settlement Agreement released it from the instant lawsuit. The first is what plaintiffs call the "implied" or "general" release argument. It concerns the proper scope to be given to a release as a matter of law. The plain language of the release nowhere mentions Envirodyne. In order to prevail, the defendant must demonstrate that such a requirement is unnecessary and that, as a matter of law, a generally worded release operates to release potential defendants from all foreseeable claims. This was the ancient common law rule under which "a release extinguished the cause of action to which it related," and a release of one party released all others jointly liable, without regard to the intent of the parties. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 343, 91 S.Ct. 795, 808, 28 L.Ed.2d 77. Unfortunately for Envirodyne, in the very same opinion, the Supreme Court put that rule to rest, rejecting it in favor of the rule set forth in the Second Restatement of Torts: "The straightforward rule is that a party releases only those other parties whom he intends to release." *Id.* at 347, 91 S.Ct. at 810.

The plaintiffs in this case assert that they did not intend to release Envirodyne by entering into the Settlement Agreement. Indeed, at the fairness hearing the plaintiffs' attorney announced to the district court that plaintiffs were reserving their rights against Envirodyne. Before we conclude, however, that the rule in *Zenith* governs this case, a more searching analysis is required.

In a case involving a federal cause of action, the extent to which a release binds parties unnamed is an issue governed by federal law. *Locafrance U.S. Corp. v. Intermodal Systems Leasing, Inc.*, 558 F.2d 1113 (2d Cir.1977) (Oakes, J.). However, because there is no general federal common law, conflicting interpretations of this mandate have arisen among the circuits. See *Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750. The Second Circuit in *Locafrance* favored a uniform federal rule—namely, that a release of a joint tortfeasor or coconspirator does not release others "unless the party signing the release intended the others to be released." *Locafrance*, 558 F.2d at 1115.

The Ninth Circuit disagrees. In *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454 (9th Cir.1986), Judge Norris readily acknowledged that the scope of the validity of a release of a federal cause of action is governed by federal law. *Mardan*, 804 F.2d at 1457. However, the court believed that the governing federal law does not require the courts to establish a uniform federal rule. Rather, the federal law in this area arises through the incorporation of "state rules of decision," which "furnish an appropriate and convenient measure of the governing federal law." *Id.* at 1458. See *Burks v. Lasker*, 441 U.S. 471, 486, 99 S.Ct. 1831, 1841, 60 L.Ed.2d 404 (in stockholders' derivative suit brought under federal law, state law should be applied).

Judge Norris' point in *Mardan* is well-taken here. In fashioning a federal rule of decision, courts must often look to the applicable state law for guidance in areas where Congress has not provided for a uniform federal rule. Therefore in *Mardan*, where the purchaser of a musical instrument plant brought an action against the vendor under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") (42 U.S.C. §§ 9601–9657 (1982)), the court applied New York law, holding that the action was barred by that state's law of release.[7] *Id.* at 1461.

The *Mardan* rule makes sense, for the alternative presented in *Locafrance* places the job of inventing a uniform federal rule within the discretion of the first federal judges that gets their hands on the issue. This leaves too much to chance. If Congress intended federal courts to be bound by a single standard when a federal cause of action arises, then it could have provided for such a rule for cases where a federal cause of action raises an accompanying question of interpretation of a related legal position.

Turning then to state law, we must examine the law of release in Illinois. In Illinois, the law of release has been re-viewed by the courts in the area of tort law as a result of the express provisions contained in the Illinois Contribution Among Joint Tortfeasors Act (Ill.Rev.Stat. ch. 70, para. 302 (1989)), which provides in part (c):

> When a release or covenant not to sue or not to enforce judgment is given in good faith to one or more persons liable in tort arising out of the same injury or the same wrongful death, it does not discharge any of the other tortfeasors from liability * * * unless its terms so provide but it reduces the recovery on any claim against the others to the extent of any amount stated in the release * * * or in amount of the consideration actually paid for it, whichever is greater.

The Illinois Supreme Court has construed the Act as applied to a generally worded release arising out of the settlement of an action for personal injuries. *Alsup v. Firestone Tire & Rubber Co.*, 101 Ill.2d 196, 77 Ill.Dec. 738, 461 N.E.2d 361 (1984). There the injured plaintiffs, who were in one car at the time of the accident, entered into a settlement containing a general release of the driver and his parents, who were in the other car, "and all other persons, firms, and corporations, both known and unknown." *Id.* at 197, 77 Ill.Dec. 738, 461 N.E.2d 361. The release also posed "a complete bar to all claims or suits for injuries or damages of whatsoever nature resulting or to result from said accident." *Id.* at 199, 77 Ill.Dec. 738, 461 N.E.2d 361. Subsequently, after discovering that a defective tire might have precipitated the accident, the plaintiff's administrator filed suit against the tire manufacturer.

On review, the Illinois Supreme Court held that the tire manufacturer was not released, despite the apparent breadth of the settlement language. In its analysis, the state court criticized the common law rule whereby the release of one tortfeasor released all joint tortfeasors, and relied instead upon the Illinois Contribution Among Joint Tortfeasors Act. Recognizing the danger that plaintiffs may "unwitting[ly] discharge * * * joint tortfeasors," *id.* at

---

7. The majority included the appropriate caveat that state law will supply the content of the federal rule so long as the governing state law

"does not in any way appear to be aberrant or hostile to federal interests." *Mardan*, 804 F.2d at 1460.

201, 77 Ill.Dec. 738, 461 N.E.2d 361, the court declined to release Firestone when it was not named or specifically designated in the release. The 1984 opinion, by the court's own admission, established a new rule of decision under Illinois law:

> We judge that the widespread use of and reliance upon general releases to discharge all tortfeasors, including those not specifically identified in the release, require that our decision here be made prospective in operation. * * * We accordingly hold that this decision will apply prospectively to releases from liability executed after the date of the filing of this opinion.

*Id.* at 202–203, 77 Ill.Dec. 738, 461 N.E.2d 361 (citations omitted). See also *Stewart v. Village of Summit,* 114 Ill.2d 23, 30, 101 Ill.Dec. 862, 865, 499 N.E.2d 450, 453 (1986) ("[T]he public policy of this jurisdiction is that no instrument purporting to terminate the liability of a tortfeasor serves to discharge any other tortfeasor from liability for the same injury unless its terms so provide.").

In this case the plaintiff class has not brought a tort suit, and the district court failed to find the analogy to tort law to be persuasive. But the law to be applied is not the law of tort but the law of release as applied to the proper interpretation of a recorded settlement agreement. The 1988 settlement release entered into by the plaintiffs should be interpreted in light of pervasive legal trends rather than the antiquated common law rule.

Here the release entered into by the plaintiffs was of the same general nature as the settlement release in *Alsup.* By settling with Navistar, the plaintiffs, along with the other settling parties agreed to settle "any and all claims, actions, causes of action, rights or liabilities, including Unknown Claims, by a Settlement Class Member or on behalf of a Settlement Class Member or by anyone claiming through or under a Settlement Class Member by way of subrogation or otherwise, that have been asserted or could have been asserted in the Chapter 11 bankruptcy proceed or in *In re Wisconsin Steel Company.*" (Settlement

Agreement at 4, reprinted in Plaintiffs' Br. at A–21). This is plainly a general release that purports to resolve all claims, but it nowhere mentions Envirodyne by name. Nor does the release mention that Envirodyne is one of the parties that plaintiffs intend to release.

There are two separate questions concerning the release, and the decisions of the Illinois Supreme Court in *Alsup* and the Supreme Court's requirement of a specific intent to release in *Zenith* provide the appropriate framework for construing the release in view of its facial ambiguity. This requires the district court to give proper consideration to the extrinsic evidence necessary to define the parties' intent.

### 2. *Envirodyne's invocation of the* alter ego *doctrine*

█ Our above conclusion does not wholly pave the way for plaintiffs' suit against Envirodyne to go forward, for Envirodyne advances another argument in favor of its position. It is what the plaintiffs characterize as the defendant's "express" release argument—that the defendant is released because WSC and EDC are specifically named in the Settlement Agreement and because Envirodyne is the parent corporation of the two subsidiaries, it benefits from the release under an *alter ego* theory.

█ Envirodyne, in advancing this argument, seeks protection from a doctrine whose purpose is to prevent a corporation that has acted fraudulently or unjustly from protecting itself from liability by shielding itself with the protective mantle of the corporate form. Essentially, defendant's argument is but another way of restating the argument that the release of one party operates to release all others. This time, however, the defendant bases its argument on a principle of corporate law— in short, the defendant has served up a red herring. As we understand its approach to the *alter ego* doctrine, defendant argues that if it is found to be the *alter ego* of the subsidiaries, then its relation to the subsidiary is close enough for Envirodyne to be considered a party to the release.

However, the *alter ego* doctrine, as invoked by Envirodyne, does not work this way. Courts will allow plaintiffs to pierce the corporate veil to impose liability on a defendant who unjustly seeks protection in the corporate form. The *alter ego* doctrine is a sword, not a shield, the basis for a cause of action, not a defense. By asserting that the *alter ego* doctrine applies to its case, Envirodyne essentially inculpates itself by admitting that WSC and EDC are corporate shells and that Envirodyne, the parent corporation, is the real party at interest in the Settlement Agreement. Envirodyne's wish to be recognized as an *alter ego* of the subsidiaries here could return to haunt it when the district court decides whether plaintiffs may pierce the corporate veil. By asserting that it is an *alter ego*, Envirodyne may be barred from stating that it is not an *alter ego* at a later stage of the litigation. In *Goldstein v. Scott*, 108 Ill.App.3d 867, 872, 64 Ill.Dec. 374, 378, 439 N.E.2d 1039, 1043 (1982), the Illinois Appellate Court recognized that a party may not assert that it is the *alter ego* and then, when it is no longer advantageous to do so, deny it. *Goldstein* involved a defendant church corporation, which sued its liability insurer for coverage on a property damage claim. A federal district court held in favor of the church believing it to be the *alter ego* of the uninsured beneficial owner of the property. *Id.* at 871, 64 Ill.Dec. 374, 439 N.E.2d 1039. Subsequently, the church attempted to escape liability for personal injuries caused by the property damage, claiming that it was not the *alter ego* of the property owner. *Id.* at 872, 64 Ill. Dec. 374, 439 N.E.2d 1039. The state appellate court concluded that the church may not assert that it is the *alter ego* and later deny it:

> [The church] having sought the finding that it was [the property owner's] alter ego * * * and having obtained the finding it so vigorously sought is judicially estopped from denying in this action that it is the [property owner's] alter ego. * * * A party cannot play "fast and loose" * * * or blow "hot and cold" during the course of litigation. When a party assumes a certain position in a legal proceeding and succeeds in maintaining that position, he may not thereafter assume a contrary position.

*Id.* at 872, 64 Ill.Dec. 374, 439 N.E.2d 1039, citing *Finley v. Kesling*, 105 Ill.App.3d 1, 60 Ill.Dec. 874, 433 N.E.2d 1112 (1982).

C. Proper Application of the *Alter Ego* Doctrine

Were we to accept the defendant's view of the *alter ego* doctrine, the Court would be sanctioning the abuse of the corporate form. In this case, the *alter ego* doctrine applies to the plaintiffs' theory of the case, for it is they who have alleged control, fraud and undercapitalization by defendant in order to pierce the corporate veil.

In cases involving claims to pension benefits protected by ERISA, it has been recognized that there is a federal interest supporting disregard of the corporate form to impose liability. ERISA protects workers from their employers' attempts to deny them pension benefits. As the First Circuit made clear in *Alman v. Danin*, 801 F.2d 1 (1st Cir.1986), where it allowed the plaintiffs to press forward with their suit against the incorporators of an underfunded corporation, "ERISA * * * cannot be said to attach great weight to corporate form," *id.* at 3.

In reaching this conclusion, the *Alman* court first examined the proper approach a court should take when it decides whether to disregard the corporate entity where a federal cause of action is asserted. First, the court noted that although "[t]here is no litmus test in the federal courts governing when to disregard corporate form," the Supreme Court has stated that "the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice." *Id.* at 3, quoting *Taylor v. Standard Gas & Electric Co.*, 306 U.S. 307, 322, 59 S.Ct. 543, 550, 83 L.Ed. 669. Moreover, the protection afforded by the corporate form might be undercut by the overriding federal legislative policy reflected in the particular statute providing an aggrieved party with a cause of action.

The underlying congressional policy behind ERISA clearly favors the disregard of the corporate entity in cases where employees are denied their pension benefits. In *Pension Ben. Guaranty Corp. v. Ouimet Corp.*, 711 F.2d 1085 (1983), certiorari denied, 464 U.S. 961, 104 S.Ct. 393, 78 L.Ed.2d 337, the First Circuit pierced the corporate veil to impose liability upon the solvent members of a corporation that had declared bankruptcy. The court emphasized that the congressional intent of ERISA is to hold employers responsible for pension benefits, so that when the corporate form poses a bar to liability, "concerns for corporate separateness are secondary to what we view as the mandate of ERISA." *Id.* at 1093; see also *Pension Ben. Guaranty Corp. v. Anthony Co.*, 537 F.Supp. 1048 (N.D.Ill.1982) (employer and parent were a single employer for purposes of imposing liability for vested, unfunded benefits; parent corporation obligated to make good on deficiency from pension plan termination). Thus under *Ouimet Corp.*, the corporate form chosen by defendant does not necessarily preclude plaintiffs from piercing the corporate veil and suing Envirodyne. If justice would be served and potential fraud nullified then plaintiffs should be able to proceed against the party that has actual control of WSC and EDC.

Conversely, widening the scope of the release so that it applies to Envirodyne would undermine the above-articulated reasons for piercing the corporate veil in the first place. In *Alman,* the court recognized that the corporate veil may be pierced more easily in ERISA cases than in pure contract cases in order to promote the federal policies underlying the statute: "Allowing [the parent] of a marginal [undercapitalized subsidiary] to invoke the corporate shield in circumstances where it is inequitable for them to do so and thereby avoid financial obligations to employee benefit plans, would seem to be precisely the type of conduct Congress wanted to prevent." *Alman,* 801 F.2d at 4.

The Ninth Circuit has previously upheld a district court's decision to disregard the corporate form so that plaintiffs in that case would recover unpaid contributions to their pension plan. *Laborers Clean–Up Contract Admin. Trust Fund v. Uriarte Clean–Up Service, Inc.*, 736 F.2d 516 (9th Cir.1984). The court recognized that the corporate defendant was a dummy corporation set up for the purpose of carrying forth the business of certain individual shareholders. In making this determination, the Ninth Circuit identified three factors: 1) the amount of respect given to the separate identity of the corporation by its shareholders; 2) the fraudulent intent of the incorporators; and 3) the degree of injustice visited on the litigants by respecting the corporate entity. *Id.* at 524. The court found that all three prongs of the test were satisfied, in particular identifying the extent to which the incorporators undercapitalized the corporation so that the corporation was unable to operate as a business or satisfy its debts.

*Alman* and *Uriarte* thus provide a framework for applying the *alter ego* doctrine to determine whether its underlying purposes have been met. The plaintiffs have yet to prove in court their entitlement to benefits from Envirodyne. If they are able to do so as a matter of law, it will be because they have successfully shown that Envirodyne is the *alter ego* of WSC and EDC so that the corporate form should be disregarded.

There is authority to suggest that the release of a subsidiary does not prevent *alter ego* claims from being brought against the parent. In *Mesler v. Bragg Management Co.*, 39 Cal.3d 290, 702 P.2d 601, 216 Cal.Rptr. 443 (1985) (Mosk, J.), the California Supreme Court construed a California statute which, like the Illinois Contribution Among Joint Tortfeasors Act, abrogated the common law rule that the release of one party released all. The court concluded that the plaintiff who settled with a subsidiary could still proceed against the parent, rejecting earlier decisions construing the same statutory provision. Contra *M/V American Queen v. San Diego Marine Construction Corp.*, 708 F.2d 1483, 1490 (9th Cir.1983); *Fuls v. Shastina Properties, Inc.*, 448 F.Supp. 983 (N.D.Cal.1978).

The *Mesler* court properly drew a distinction between cases where the corporate veil is pierced so that a parent is held liable for the actions of a subsidiary and cases where the parent attempts to evade liability by benefitting from a release that applies to a subsidiary. In cases where the veil is pierced to expose the parent to liability, it is not as though one corporation is held liable for the acts of another corporation; instead a "hole" is "drilled in the wall of limited liability erected by the corporate form." *Id.* 702 P.2d at 607, 216 Cal.Rptr. at 449. Aside from the liability of the parent where the *alter ego* doctrine applies, the corporate form remains intact. Therefore, the veil is pierced only to the extent that justice requires and no further.

While permitting veil-piercing in the above equitable circumstances, the *Mesler* court addressed the situation in which the parent invokes the *alter ego* doctrine to benefit from a release and escape liability. According to its rationale, if the wall of the corporate form remains erect in all other respects, "when the plaintiff settles with only the subsidiary, the parent's liability continues. To hold otherwise would be to defeat the policy of promoting justice that lies behind the alter ego doctrine." *Id.* The opinion in *Mesler* provides a credible argument that the *alter ego* doctrine can be invoked to impose liability on a parent even when the plaintiff settles with the subsidiary.[8]

Envirodyne claims that the equities favor its position, and that the Settlement Agreement requires that it be relieved from any further liabilities. However, Envirodyne's desire to remain insulated by the settlement release cannot bar the plaintiffs' claim to benefits, where Envirodyne provides the only recourse for the plaintiffs to recover their vested pension benefits. Therefore, justice can hardly be said to require that the release be interpreted broadly so as to exonerate a party unnamed in the release.

Moreover, Envirodyne does not contest the plaintiffs' claim that the subsidiaries, WSC and EDC, were set up specifically for Envirodyne's purchase of the Division. Yet the plaintiffs allege that the corporate veil should be pierced because the two subsidiaries were grossly undercapitalized and appear to have been set up for no other reason than to insulate the parent, Envirodyne, from potential claims against the Division for pension benefits or other liabilities. See *Pension Ben. Guaranty Corp. v. Envirodyne Industries, Inc.*, 10 EBC 1458, 1462 (N.D.Ill.1988). At least from the perspective of Lehman Brothers, which issued a report concerning the sale by Navistar of the Division to the two subsidiaries of Envirodyne, the transaction was a fraud, and the report demanded that Envirodyne assume responsibility for the pension benefits instead of insulating itself from liability by creating a corporate shell.

Because in all probability Envirodyne has not been released by the Settlement Agreement, the plaintiffs will be able to present their case for piercing the corporate veil in the district court. In order to prevail, the plaintiffs must satisfy the requirements for piercing the corporate veil. Under Illinois law, two factors are required:

[F]irst, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and second, circumstances must be such that an adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.

*Koch Refining v. Farmers Union Central Exch., Inc.*, 831 F.2d 1339, 1345 (7th Cir. 1987), certiorari denied, 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237, quoting *Gallagher v. Reconco Builders, Inc.*, 91 Ill. App.3d 999, 1004, 47 Ill.Dec. 555, 558–59, 415 N.E.2d 560, 563–564 (1980); see also *In re Kaiser*, 791 F.2d 73, 75 (7th Cir.1986) (permitting *alter ego* claims whenever reliance on the corporate form would "defeat some strong equitable claim"), certiorari denied, *Wise v. Kaiser*, 479 U.S. 1011, 107

---

**8.** The court in *Mesler* analogized to agency cases in different jurisdictions in which a suit against the principal is not precluded by the release of the agent. *Mesler*, 39 Cal.3d at 303 n. 5, 702 P.2d at 608 n. 5, 216 Cal.Rptr. at 450 n. 5.

S.Ct. 655, 93 L.Ed.2d 710. As to the first requirement of the Illinois *alter ego* doctrine, the plaintiff must show the degree of control by the parent by "presenting evidence of misrepresentation; commingling of funds, assets, or identities; undercapitalization; failure to operate at arm's length; and failure to comply with corporate formalities." *Koch Refining,* 831 F.2d at 1345, citing *Main Bank v. Baker,* 86 Ill.2d 188, 205–206, 56 Ill.Dec. 14, 22, 427 N.E.2d 94, 102 (1981).

The second requirement of the Illinois *alter ego* doctrine—that adherence to the corporate form would give rise to fraud or injustice—will apply if the plaintiff proves the existence of either fraud (such as intentional wrongdoing) or injustice. *Koch,* 831 F.2d at 1345. However, proper application of Illinois' test for piercing the corporate veil invariably involves factual questions to be determined by the circumstances of each case. *Id.,* citing *Stap v. Chicago Aces Tennis Team, Inc.,* 63 Ill.App.3d 23, 28, 20 Ill.Dec. 230, 234, 379 N.E.2d 1298, 1302 (1st Dist.1978). In *Koch Refining,* this Court conducted an individualized inquiry based on the Illinois *alter ego* doctrine to conclude that a bankruptcy trustee can pierce the corporate veil to bring an *alter ego* claim against the debtor corporation's shareholders.

D. The Possibility of Bringing Claims Against Envirodyne in the Bankruptcy Proceeding

■ Envirodyne has two remaining arguments to support its claim that the settlement release should operate to relieve it from liability for the plaintiffs' lost pension benefits. Rather than addressing whether or not Envirodyne actually is released, these arguments concern other provisions in the Settlement Agreement. Defendant's first argument addresses language preventing "any and all claims * * * that have been asserted or could have been asserted in the Chapter 11 bankruptcy proceeding." (Settlement Agreement at 4, reprinted in Plaintiff's Br. at A–21). The question, then, is whether a claim against Envirodyne "could have been asserted" in the Chapter 11 bankruptcy proceeding.

At first glance, it would appear that the answer to the question is "yes." This Court has held previously that *alter ego* claims may be brought in bankruptcy by the trustee of a bankrupt corporation, *Koch Refining v. Farmers Union Central Exchange, Inc.,* 831 F.2d 1339, 1346 (7th Cir.1987). However, the Court recognized that trustees had standing to bring only those claims which apply to all creditors of the debtor corporation generally. *Id.* at 1349. As the Court in *Koch Refining* stated: "If the liability is to all creditors of the corporation without regard to the personal dealings between such officers and such creditors, it is a general claim," *id.* Alternatively, the Court recognized that "the trustee has no standing to bring *personal* claims of creditors. A cause of action is 'personal' if the claimant himself is harmed and no other claimant or creditor has an interest in the cause," *id.* at 1348 (emphasis in original).

In the Chapter 11 proceeding, *In re Wisconsin Steel Company,* Nos. 80 B 3766 through 80 B 3773, Adversary No. 81 A 0442, 1989 WL 39995 (Bktcy.N.D.Ill.), the former employees of the Division comprised only one of the several creditors in the proceeding. They were the only creditors to assert claims for lost pension benefits. Their claims are properly described as personal claims and not general claims. The logic of *Koch Refining* therefore leads necessarily to the conclusion that plaintiffs' *alter ego* claims against Envirodyne could not have been asserted in the bankruptcy proceeding because they were not claims of the creditors generally but ERISA claims unique to the former employees.

E. Envirodyne's Potential Claims Against Navistar

■ The final argument advanced by Envirodyne in its attempt to show that it was released from claims by the plaintiffs concerns the possibility that Envirodyne might bring claims against Navistar as a result of this litigation. Plainly, the settlement agreement releases Navistar from any further liabilities stemming from its sale of the Division to the subsidiaries of

Envirodyne. Therefore, if as a result of this suit Navistar were exposed to additional liability, plaintiffs' suit would violate the terms of the settlement agreement.

In his order granting Envirodyne's motion to dismiss, Judge Moran addressed the possibility that the defendant would bring a claim against Navistar. He concluded that a suit by Envirodyne against Navistar was a possibility at the time that the plaintiffs entered into the settlement agreement. Therefore, it was not, in Judge Moran's view, relevant that at the conclusion of the trial in *Pension Ben. Guaranty Corp. v. Envirodyne Industries, Inc.*, he held that Navistar was liable only for pension benefits accruing until 1977, the year the Division was sold to the subsidiaries of the defendant. See District Court Memorandum and Order of November 7, 1989, at 9–10 (Plaintiffs' Br. at A–10—A–11).

The district court's analysis was incomplete concerning Navistar's potential liability to Envirodyne, for Judge Moran's decision at trial does not provide the only bar to any suit Envirodyne might bring against Navistar. As the plaintiffs correctly point out, their *alter ego* claims against Envirodyne are in fraud, alleging that Envirodyne knowingly set up undercapitalized subsidiaries in order to escape any liabilities for claims arising out of its acquisition of the Division. Envirodyne cannot impute its fraud to another party. If it is liable to the plaintiffs under an *alter ego* theory, then it is liable for its own improper intentional actions and cannot obtain indemnification from Navistar.

Moreover, any right of contribution that Envirodyne might have against Navistar is properly limited by the method this Court has identified for determining contribution rights under ERISA. Contrary to the plaintiffs' assertion, a non-settling defendant does possess a right of contribution under ERISA. *Donovan v. Robbins*, 752 F.2d 1170 (7th Cir.1985). The *Donovan* Court identified this right to contribution, but went on to reject the traditional rule that imposes no limit on the non-settling defendant's right to contribution. *Id.* at 1180. Instead, *Donovan* advocated the adoption of a rule based on comparative fault. Under a comparative fault regime, no party pays more than its adjudicated fair share. As explained in *Donovan:*

> [T]he court fixes the percentage of the plaintiff's damages that is attributable to the fault of the settling defendants, multiplies that percentage by the judgment against the nonsettling defendants, and deducts the resulting amount from the judgment.

*Id.* Judge Moran has in essence satisfied the comparative fault inquiry recommended in *Donovan* by establishing that Navistar was liable for pension benefits due to the plaintiffs only up to the time of the sale of the Division.[9] Envirodyne no longer has any possible claim against Navistar.[10]

### F. The Applicable Statute of Limitations

■ Because the district judge concluded that the settlement release applied to Envirodyne, he saw no need to reach the statute of limitations issue. However, because the Settlement Agreement is ambiguous and requires additional fact-finding to determine the parties' intent, it is necessary to address the statute of limitations. Envirodyne raises the issue as an affirmative defense to the suit against it.

The plaintiffs filed suit against Envirodyne in February 1989, nine years after the Division went into bankruptcy. ERISA it-

---

9. Judge Moran's ruling is on appeal. See note 1 *supra.*

10. Although *Donovan* concludes that there is a right to contribution under ERISA, this matter is still unsettled. In a 1989 district court decision, *Mutual Life Ins. Co. v. Yampol*, 706 F.Supp. 596 (N.D.Ill.1989), Judge Leinenweber concluded that "ERISA does not expressly create a right of contribution in favor of fiduciaries." *Yampol*, 706 F.Supp. at 598. He referred to the opposite conclusion in *Donovan* as dictum and concluded that the fiduciary in that case had failed to satisfy the Supreme Court's preconditions for finding a federal right of contribution under a statute that does not expressly create such a right. See *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500; *Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750.

self does not impose a statute of limitations under Section 502, the civil enforcement provision; therefore the district court must apply the most appropriate state statute of limitations so long it is consistent with federal law and policy. *Wilson v. Garcia,* 471 U.S. 261, 266–267, 105 S.Ct. 1938, 1941–1942, 85 L.Ed.2d 254; *Central States, Southeast and Southwest Areas Pension Fund v. Jordan,* 873 F.2d 149, 152 (7th Cir.1989).

This Court has held previously that an employee's claimed eligibility for pension benefits is a creature of contract law. *Jenkins v. Local 705 International Brotherhood of Teamsters Pension Plan,* 713 F.2d 247 (7th Cir.1983). Under Illinois law, there are two separate statutes of limitations for actions on contracts. For actions on oral contracts, the statute of limitations is five years. Ill.Rev.Stat. ch. 110, para. 13–205 (1989). Alternatively, a ten-year statute of limitations applies to actions on written contracts. Ill.Rev.Stat. ch. 110, para. 13–206 (1989).

To determine which statute of limitations properly applies, the nature of the plaintiffs' claims must be examined. The plaintiffs have brought their suit under ERISA Section 502(a)(1)(B) for lost benefits due to them under the pension plan. Presumably the pension plan in this case is at least written in part, so that the Illinois ten-year statute of limitations applies. Our conclusion is fully consistent with the decisions of this Court in *Jenkins* and *Jordan*. *Jenkins* held that an employee's action to recover pension benefits based on the written terms of a pension plan was governed by the Illinois ten-year statute of limitations, 713 F.2d at 253, and *Jordan* recognized that although the pension plan in that case was based at least in part based on orally conducted collective bargaining negotiations, an ERISA delinquency action was still governed by the ten-year statute of limitations because the longer statute of limitations "contribute[d] to the stability of pension funds and * * * encourage[d] employers to meet their obligations." 873 F.2d at 154.

Despite this Court's decisions in *Jordan* and *Jenkins* applying the ten-year statute of limitations to actions arising under ERISA and the LMRA, Envirodyne argues that the shorter limitations period should apply when an *alter ego* theory is alleged, because parol evidence is indispensable, as the party to be held liable is not named in the contract. As support, defendant cites *Baird & Warner, Inc. v. Addison Indus. Park, Inc.,* 70 Ill.App.3d 59, 73, 26 Ill.Dec. 1, 13–14, 387 N.E.2d 831, 843–844 (1st Dist. 1979). That case is distinguishable because it involved purely a matter of state law. The application of a state statute of limitations to a federal cause of action is "ultimately a question of federal law." *Jordan,* 873 F.2d at 154, citing *International Union, etc. v. Hoosier Cardinal Corp.,* 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192; *Jenkins,* 713 F.2d at 251. The decisions of the Illinois courts regarding the applicability of the two statutes of limitations are helpful but not binding, for they do not take into consideration the national interests at stake. *Jordan,* 873 F.2d at 154.

As explained above, as a matter of federal policy the longer statute of limitations should apply, because the plaintiffs' claims are for vested pension benefits that have allegedly become due to them over a period of years. To truncate the available period for claims by applying the shorter statute of limitations would fly in the face of ERISA. Pension benefits vest and accrue throughout the career of an employee. They are often paid out over a period of several decades. Moreover, the difference between the two statutes of limitations may be explained by the fact that parties to a written contract can demonstrate the existence of their bargained-for-exchange over a longer period of time, for the agreement is evidenced by the writing. An oral contract, on the other hand, if not important enough to memorialize in writing, is less deserving of legal protection over time, and liability may be harder to prove, presumably because the parties must rely on memory to recollect the terms of the oral agreement in court.

Despite the fact that some of the plaintiffs' claims are based on the collective

bargaining agreement and are brought under the LMRA, there is no basis in federal law for characterizing their claims as an oral contract for purposes of the statute of limitations. See *Trustees of Wyoming Laborers Health and Welfare Plan v. Morgen & Oswood Constr. Co.*, 850 F.2d 613, 621 (10th Cir.1988) (Wyoming's ten-year statute of limitations for written contracts applies to actions brought under ERISA and LMRA Section 301). Indeed, federal policy favors the protection of pension benefits, and it would surely yield a result anomalous with the legislative history and purpose of ERISA to nip claims for vested pension benefits in the bud through application of the shorter statute of limitations.

### III. *Conclusion*

This decision paves the way for the plaintiffs to present their case against Envirodyne more fully in the district court. We cannot decide the merits of the plaintiffs' ERISA and LMRA claims for lack of a sufficiently developed record. Since the scope of the settlement release comes down to a question of the parties' intent in view of the Settlement Agreement's ambiguity, the matter is remanded to the district judge for a full evidentiary inquiry.

Cause remanded for further proceedings in accordance with this opinion.