**LAKE FOREST ACADEMY, Plaintiff,**

v.

**AMERICAN LANGUAGE ACADEMY, Defendant.**

No. 91 C 1108.

United States District Court, N.D. Illinois, E.D.

Sept. 27, 1991.

C. William Bockelman, Jr., O'Neill & Bockelman, P.C., Lake Forest, Ill., for plaintiff.

Warwick R. Furr, II, W. Eric Pilsk, Shaw, Pittman, Potts & Trowbridge, McLean, Va., Williams & Montgomery, Chicago, Ill., of counsel, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Lake Forest Academy ("Lake Forest" in this opinion, though the parties' agreements refer to it as "The School") filed a Complaint (the "Complaint") against American Language Academy ("American" in this opinion, though the parties' agreements and the Complaint refer to it as "ALA") in the Circuit Court of the Nineteenth Judicial Circuit, Lake County, Illinois, seeking a declaratory judgment as to the validity of a renewal clause (the "Renewal Clause") in Paragraph 9[1] of an agreement ("Second Agreement") between the two Academies. In relevant part the Complaint alleges:

9. That LFA contends that [Second Agreement ¶ 9] does not provide ALA with the unilateral right to perpetually renew the Agreement for successive terms of three (3) years upon the same terms and conditions of [the Second] Agreement [ ].

10. That LFA contends that [Second Agreement ¶ 9] is unconscionable and thus has no force and effect or in the alternative, the entire Agreement has no force and effect.

11. That LFA contends and ALA by its own actions admits that the [Second Agreement] is without definite duration and is therefore terminable at the will of either of the parties or in the alternative, will continue for a reasonable time under the circumstances which AFA contends has [sic] already occurred.

American properly removed this case to this Court on February 21, 1991 under 28 U.S.C. §§ 1441 and 1446.[2]

Both Lake Forest and American now move for summary judgment under Fed. R.Civ.P. ("Rule") 56.[3] For the reasons stated in this memorandum opinion and order, Lake Forest's motion for summary judgment is denied and American's is granted.[4]

### Facts

Lake Forest is a college preparatory school located in Lake County, Illinois. American is engaged in the business of

---

1. Complaint ¶¶ 8–10 and P. 12(m) ¶ 13 (see n. 3) mistakenly refer to the Renewal Clause (Second Agreement ¶ 9) as Paragraph 8. P.Mem. 1, however, refers to the renewal paragraph by the correct number. This opinion has corrected all the inaccurate citations to reflect the correct paragraph number.

2. Lake Forest and American are citizens of and have their principal places of business in Illinois and Maryland respectively, and the amount in controversy exceeds $50,000. Accordingly this Court has jurisdiction over this action under 28 U.S.C. § 1332(a)(1).

3. Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) and cases cited there). What follows in the "Facts" section of this opinion is really not in dispute, so that this case does not pose the problems often created by the need for this Court to adopt a Janus-like set of dual perspectives on cross-motions for summary judgment (see *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991)), which repeats the familiar principle that courts are to draw "those inferences that are reasonable" in the light most favorable to each nonmovant). Relatedly, this District Court's General Rule ("GR") 12(m) requires factual statements in support of Rule 56 motions, and both sides have tendered such statements with their cross motions (respectively cited "P. 12(m) ¶ —" and "D. 12(m) ¶ —."). Unlike American, however, Lake Forest failed to comply with GR 12(m), which requires in all GR 12(m) statements:

> specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in [each] paragraph.

If it were not so clear from the agreed-upon facts what the Second Agreement means, Lake Forest might have lost its case merely on its failure to comply with GR 12. Without support in the record, its own GR 12(m) statement has no evidentiary value. And having also not responded to D. 12(m) with the requisite GR 12(n) statement, it has also admitted the assertions in D. 12(m) (*Appley v. West*, 929 F.2d 1176, 1179 (7th Cir.1991) (per curiam)).

4. American has filed two counterclaims against Lake Forest, but neither is a subject of the present motion, which relates only to Lake Forest's claim seeking a declaratory judgment.

teaching the English language to persons who do not speak it. On June 25, 1979 Lake Forest and American entered into a written agreement ("First Agreement") allowing American to operate an English-as-a-second-language program on the Lake Forest campus. That Agreement was to be in effect from August 1, 1979 until August 31, 1984 and contained this renewal clause (First Agreement ¶ 9):

ALA shall have an option to renew this agreement for successive terms of three (3) years each, commencing with the expiration of the original agreement term. All provisions in effect under the original agreement term shall govern any such renewal terms. In the event that ALA elects to exercise its option to renew this agreement following the original or any succeeding term, ALA shall give to The School, not less than six (6) months prior to the expiration of the then-current term, written notice of its intent to exercise such option.

First Agreement ¶ 11 also contained a provision as to its potential early termination:

(a) In the event that either party is found in material breach of any provision of this agreement, the party in breach shall have thirty (30) days to correct such breach, commencing with the receipt of notice of breach from the other party. If, upon the expiration of the thirty (30) days, the breach of provision continue [sic] uncorrected, the party giving notice of breach may elect to give notice of termination to be effective not less than thirty (30) days from the date of such notice.

(b) Except as provided in the preceding Paragraph 11(a), this agreement shall operate as a notice of termination, and both parties waive all other notices of termination.

(c) Nothing in this paragraph shall entitle either party to notice of termination upon expiration of this agreement.

(d) For any breach other than a material breach, neither party shall have any right to terminate or cancel this agreement, but shall be limited to money damages.

Finally, Agreement ¶ 13 contained anti-oral-waiver and integration clauses:

(a) This agreement constitutes the entire agreement and understanding of the parties and no other prior oral or written communications will be of any further force and effect.

(b) The School and ALA may, by mutual agreement, amend or waive provisions in this agreement, but, except for any overriding statute or constitution, nothing other than a written amendment or waiver clearly denominated as such and duly executed by the parties hereto, their successors and permitted assigns, shall operate to amend or waive any of these provisions.

Before the First Agreement expired, Lake Forest asked for certain modifications to provide additional revenue guaranties to Lake Forest and to provide for greater integration of American students into Lake Forest's curricular and extracurricular activities. Lake Forest and American entered into negotiations that culminated in the Second Agreement (dated November 21, 1983), which implemented those changes and repeated verbatim the same clauses already quoted from the First Agreement.[5]

Second Agreement ¶ 2(b)(1) introduced a new provision expressly linking the fees payable to Lake Forest by American to Lake Forest's tuition charges to its own full-time students from time to time:

(b) For the foregoing facilities, services, accommodations, and room and board, ALA shall pay to The School a fee per full-time ALA student enrolled per ALA academic term, according to the following schedule:

(1) During the academic year, forty-eight percent (48%) of The School tui-

---

**5.** As indicated in the text, except for the Second Agreement's capitalization of the word "Agreement", those paragraphs are identical in the two Agreements, even including the grammatical er-

ror in Paragraph 11(a). Accordingly the Second Agreement's provisions will be referred to simply as "Paragraph—" unless the two Agreements differ.

tion and room and board fees for each ALA student enrolled in the program. The number of students for which ALA will guarantee such payment will be mutually agreed upon by November 1 of the preceding academic year and will be no fewer than twenty (20) nor more than thirty-five (35) students. If no figure is mutually agreed upon, the twenty (20) student minimum will be in effect.

And like the First Agreement, Second Agreement ¶ 2(d) also contained the following allowance for price changes:

Future increases or decreases in the fees payable under this Agreement shall be effected to ensure that such fees payable continue always to bear the same proportion that fees herein specifically defined bear to the sum of The School's 1979–80 boarding student tuition and comprehensive fee.

Even though the Second Agreement was entered into in late 1983, it was to take effect on expiration of the First Agreement: It ran for a period of 60 months beginning September 1, 1984 and ending August 31, 1989.

In 1985 the Second Agreement was amended by the "Amendment," but the Amendment affected neither the term nor any of the relevant clauses quoted earlier.[6] On February 24, 1989 American sent notice to Lake Forest that American had elected to exercise its option to renew the Second Agreement for three years after August 31, 1989. Since then the parties have been operating under the terms and conditions

6. Instead the Amendment dealt with the "criteria" for determining whether students would be counted in the "minimum enrollment guarantee."

7. Because this case sounds in diversity, this Court must look to Illinois law—including its choice of law doctrines—for the applicable rules of decision (*Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.*, 917 F.2d 278, 286 (7th Cir.1990)). *Purcell & Wardrope Chtd. v. Hertz Corp.*, 175 Ill.App.3d 1069, 1079, 125 Ill.Dec. 585, 592, 530 N.E.2d 994, 1001 (1st Dist.1988) teaches that Illinois courts use the "most significant contacts" test for contract disputes:

The factors to be considered in determining which state has the most significant relation-

of the renewed Second Agreement, as amended, which will expire—unless further renewed—on August 31, 1992.

*Contractual Meaning*

Despite the plain language of the Renewal Clause that American has the "option to renew this agreement for successive terms of three (3) years each," Lake Forest's Mem. 2 advances two theories supporting the notion that the Clause does not mean what it says:

It is clear from the conduct of the parties that they viewed the contractual arrangement as one with a defined term, and thus required the preparation and execution of a new contract at the end of each term.

\* \* \* \* \* \*

Rather than giving ALA the unilateral right to perpetually renew the [Second] Agreement, LFA maintains that by the terms of the Agreement and Illinois law, ALA is entitled to only one renewal.

Simultaneously-filed D.Mem. 7 meets that contention head on:

The language of [the Renewal Clause] is plainly not ambiguous. It is clear and direct, and reasonably susceptible to only one meaning: that it provides ALA the option to renew the agreement for successive terms, providing that ALA properly exercises its option and that neither party terminates the Agreement for cause.

Both American's arguments call for an interpretation of the Second Agreement under Illinois law.[7] *Lumpkin v. Envirodyne*

ship to a contract claim are: the place of negotiation, the place of execution or contracting, the place of performance, the location of the subject matter of the contract, and the domicile, residence, place of incorporation, and the business of the parties.

Here Lake Forest's Illinois location means that both the performance of the contract and its subject matter are in Illinois. Although American is a citizen of Maryland, all the other significant signals point to Illinois. Furthermore, each side has focused on Illinois substantive law in its briefing, and this Court will not question the parties' assumption (*Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426–27 (7th Cir.1991)).

*Industries, Inc.*, 933 F.2d 449, 456 (7th Cir.1991) (citations omitted) explains:

> In construing the terms of a contract, a court is required to engage in a two-fold inquiry. First, it is necessary to look to the plain language of the provision at issue. Reviewing Illinois law, this Court has noted that "[t]he starting point must be the contract itself. If the language of the contract unambiguously provides an answer to the question at hand, the inquiry is over." If the plain language of the contract is ambiguous, then "the court must go on to declare [the contract's] meaning." If the court finds that a contract is ambiguous and that extrinsic evidence is undisputed, then the interpretation of the contract remains a question of law for the court to decide.

At the outset of that "two-fold inquiry" this Court must turn to the plain language of the Second Agreement to determine whether it is ambiguous on its face. *Riney v. Weiss & Neuman Shoe Co.*, 217 Ill. App.3d 435, 160 Ill.Dec. 375, 380, 577 N.E.2d 505, 510 (4th Dist.1991) (citations omitted) states:

> A contract is ambiguous if its terms are capable of being understood in more than one sense because either an indefiniteness of expression or a double meaning is attached to them. A provision is not rendered ambiguous simply because parties do not agree on its meaning.

In this instance the Renewal Clause can fairly be understood in only one way: It explicitly states that American has the right to renew for "successive *terms*"— more than one. And if that plural term

left any room for doubt, the clause goes on to say that the right of renewal arises "following the original, or *any succeeding term*." Unless there is some other reason under the law to limit the contract terms, then, *Lumpkin* states that this Court's "inquiry is over."

Lake Forest's assertion that the "conduct of the parties" should be considered by this Court to assist in its interpretation of the contract is without merit.[8] Lake Forest offers no extrinsic evidence to show that the language is ambiguous or that the words in fact mean something other than what they say. This is not a situation in which (*FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 620 (7th Cir.1989)):

> although the agreement itself is a perfectly lucid and apparently complete specimen of English prose, anyone familiar with the real-world context of the agreement would wonder what it meant with reference to the particular question that has arisen.[9]

Nor is there any hint in the record that "successive terms" is capable of more than one meaning.

Indeed, even if both parties mistakenly thought that the Second Agreement meant something other than its plain language, in the absence of any ambiguity that plain language controls. As *Riney*, 217 Ill. App.3d at 510, 160 Ill.Dec. at 380, 577 N.E.2d at 510 (citation omitted) explains, extrinsic evidence may be used only to show that the words in the contract have either "an indefiniteness of expression or a

---

8. Neither Lake Forest's P. 12(m) statement nor its Mem. at 2 refers to any "affidavits, parts of the record, and other supporting material" to show any particular conduct of the parties. In fact, Lake Forest does not mention any conduct except for the parties' negotiation of and entry into the two Agreements, the one Amendment and the current renewal. Instead the only reference in the record as to other conduct of the parties is that offered by American's D. 12(m) statement, which includes a deposition by Thomas Hodgkins ("Hodgkins"), Lake Forest's current Headmaster and a member of its Board of Trustees in 1979 and 1983 when the Board voted to approve the Agreements. Hodgkins undoubtedly knew what the Renewal Clause

meant—though he may have thought it "unfair": Hodgkins Dep. 23 states:

> Lake Forest Academy's position is and has been since before the date of this letter that [the Renewal Clause] constitutes what we have called an ever-green concept, which gives the unilateral right to American Language Academy to continue the contract in effect forever through exercising successive three-year terms at its own option.

9. [Footnote by this Court] Whether Illinois courts should look to any extrinsic evidence to determine ambiguity in the contract is not settled (see *Riney*, 217 Ill.App.3d at 509–10, 160 Ill.Dec. at 379, 577 N.E.2d at 509).

double meaning." [10]   As already stated, *Riney, id.* (citation omitted) then goes on to say:

> A provision is not rendered ambiguous simply because parties do not agree on its meaning.

Despite the clarity of American's right to "successive" renewals, Lake Forest counters with two contentions:

1. "[B]y the terms of ... Illinois law, American is entitled to only one renewal" (P.Mem. 2–3). [11]

2. In the alternative the Second Agreement is terminable at will because (P.Mem. 4–5):

> Under Illinois law, a contract which fails to fix a time for its duration and calls for continuous performance is ordinarily terminable at the will of either party.

Both arguments are premised on the fiction that if American has the right to renew the Second Agreement perpetually, it is facially a perpetual contract. But even if that were assumed to be true, [12] neither position helps Lake Forest here. They will be discussed in turn.

One Renewal or Successive Renewals?

■   P.Mem. 3 urges that there are only two ways that this Court can interpret the Second Agreement under Illinois law: Either it is a perpetual contract, in which case it is "void," or in the alternative it must only allow for "a single renewal." That poses a false dilemma, for the cases that Lake Forest cites simply do not dictate those exclusive alternatives.

For example, *Schumacher v. Fatten,* 18 Ill.App.2d 387, 394, 152 N.E.2d 402, 406 (2d Dist.1958) held that lease for a specified five-year term "with option to renew," and with nothing else said about renewal, obviously denoted a single renewal of the same length as the underlying contract. And the only other case to which Lake Forest refers, *Davis v. Nokomis Quarry, Inc.,* 77 Ill.App.3d 1011, 1015, 33 Ill.Dec. 883, 887, 397 N.E.2d 216, 220 (5th Dist.1979), accurately explained *Schumacher* in these terms:

> We regard *Schumacher* as standing for the proposition that absent clear manifestation of the parties' contrary intent, an option to renew will effect but a single extension of the same length as the original lease.

Thus *Schumacher,* which provides a rule of construction only when the contract conveys no contrary meaning, unquestionably does not apply here. In this case the Renewal Clause contains a "clear manifestation of the parties' ... intent" to give American an option to renew the contract repeatedly for "successive terms of three (3) years each." "Successive terms" just as unquestionably includes the possibility of more than one renewal, for the Renewal Clause goes on to state (emphasis added):

> In the event that ALA elects to exercise its option to renew this agreement following the *original* or any *succeeding* term. . . .

Hence the total absence of any even arguable ambiguity leaves no room to use the

---

**10.**   That statement of Illinois law is all of a piece with the general principle that the reading of contracts is normally a search for the objective meaning of the language used, not what one contracting party *now* says that it had in mind but did not communicate to the other party (see Learned Hand's classic "twenty bishops" statement in *Hotchkiss v. National City Bank of New York,* 200 F. 287, 293 (S.D.N.Y.1911), *aff'd,* 201 F. 664 (2d Cir.1912), *aff'd,* 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913)). And of course it cannot be ignored that a litigant's current statement of its alleged frame of mind at an earlier date comes *after* a dispute has already arisen—so that a court has reason to be concerned lest the statement of purported current recollection may be the product of wishful thinking or worse.

**11.**   P.Mem. at 2 also asserts that the language of the Second Agreement gives American the right to renew the Agreement only once. That is entirely unpersuasive, for (as already discussed) the contract provides for "successive" renewals.

**12.**   What seems the more sensible view—but one that undermines Lake Forest's argument—is that the Second Agreement does not have a perpetual duration, but rather has a definite term that may be renewed by American for a series of successive terms of three years. In any event, the semantic difference between a successive series of terms and perpetual duration does not matter to the outcome here.

gap-filling rule in *Schumacher* to construe the Second Agreement.[13]

■ Because the Second Agreement expressly provides for the possibility of successive terms that could perhaps lead to a perpetual contract, does Lake Forest's proposed alternative—that the Agreement is void—shut the door on American? Absolutely not. Even P.Mem. 3 admits that *Davis* "recognized the validity of a perpetual lease"[14] when it held (77 Ill.App.3d at 1017, 33 Ill.Dec. at 888, 397 N.E.2d at 221, paraphrased by substituting "contract" for "lease"):

> Whether the [contract] is considered a perpetual [contract], or a [contract] for a one year term containing a covenant of perpetual renewal for a like term unless terminated as expressly provided therein, we hold that the intention of the parties to enter into such a perpetual [contract] is clearly and unambiguously expressed in the terms of the [contract].

To hold that the perpetual lease there was intended, *Davis* pointed to such language as "from year to year thereafter" or (in another case cited by the *Davis* court) "succeeding years" to prove that the parties intended that there be more than one renewal. In precisely the same way, the words "successive terms of three (3) years each" in the Renewal Clause convey the clear meaning that American has the perpetual right to renew the contract for those successive terms. And like the Appellate Court in *Davis*, this Court also holds that the Second Agreement is unambiguous: It gives American the absolute option to renew for another three-year term at the end of the current term and for successive terms thereafter.

**Terminable at Will?**

■ One untenable argument by Lake Forest begets a second: It contends that if the Second Agreement does offer the possibility of perpetual duration, it can be terminated at will by either party. P.Mem. 5 cites two cases for that proposition: *Consolidated Laboratories, Inc. v. Shandon Scientific Co.*, 413 F.2d 208, 211 (7th Cir. 1969) and *Stein v. Isse Koch & Co., Chicago*, 350 Ill.App. 171, 112 N.E.2d 491 (1st Dist.1953). But the rule announced in both those cases applies only if both the contract's duration and the manner in which it can be terminated are in doubt (*Consolidated Laboratories*, 413 F.2d at 211–12; *Stein*, 350 Ill.App. at 176, 112 N.E.2d at 493). In such a case the contract is left entirely unclear as to whether or when it can be terminated, so it may be assumed that it is an at-will contract. Significantly, the courts in both *Consolidated Laboratories* and *Stein* found that the manner in which the contracts before them were to terminate was *not* in doubt, so that neither case required an at-will construction of the contract.

Just so, no doubt exists here. First, the Second Agreement had an initial duration of five years, with each subsequent renewal specified as three years in length. Second—even if this Court were to accept the bizarre notion that just because American could perpetually renew the Second Agreement its duration is somehow rendered unclear[15]—there is another fundamental reason why this contract cannot possibly be terminable at will: Paragraph 11 sets forth specific conditions upon which the Second Agreement may be terminated.

As *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007,

---

**13.** If Lake Forest's contention were correct, *Schumacher* would have dictated the renewal of the Second Agreement for five years, the term of the original contract. That is not only inconsistent with the parties' actual conduct, but would also be squarely contrary to the plain dictates of the Renewal Clause, which specifies renewals for "three (3) year terms."

**14.** *Davis*, 77 Ill.App.3d at 1014, 33 Ill.Dec. at 886, 397 N.E.2d at 219 supports its reasoning by the earlier judicial enforcement in Illinois of a "999 year lease," which:

> is persuasive evidence that an otherwise valid lease is not rendered invalid by the extreme duration of its term.

**15.** As already indicated, *Davis*, 77 Ill.App.3d at 1014, 33 Ill.Dec. at 886, 397 N.E.2d at 219 states that even a perpetual contract is valid. To say that a contract clearly states that it is perpetual does not mean that the duration is ambiguous, so as to trigger the rule of *Consolidated Laboratories* and *Stein*.

1012 (7th Cir.1985), citing *Consolidated Laboratories*, 413 F.2d at 212, explains:

> If a contract is terminable upon the occurrence of some event, neither party may terminate at will.

Looking at language nearly identical to that in Paragraph 11, *First Commodity Traders*, 766 F.2d at 1012 found:

> This paragraph sets forth a specific event upon which the contract may be terminated: breach. The circumstances and nature of the agreement indicate the parties' intent to create a relationship terminable for breach, rather than terminable at will.

In like manner, when Paragraph 11(a) unequivocally gives one party the right "to give notice of termination" upon breach by the other party, it surely "indicate[s] the parties' intent to create a relationship terminable for breach, rather than terminable at will." And if that were not clear enough, Paragraph 11(d) states:

> For any breach other than a material breach, neither party shall have any right to terminate or cancel this agreement. . . .

In short, the Second Agreement is plainly neither terminable at will[16] nor void for having the possibility of perpetual duration, nor does it limit American to only one renewal. Once more, the Second Agreement's Renewal Clause means precisely what it says: American has the "option to renew this Agreement for successive terms of three (3) years each."

### *Unconscionability*

■ Likely aware of the untenability and hence this Court's certain rejection of its direct attack on the clear and unambiguous language of the renewal clause, Lake Forest aims its guns at another, but in the end equally unreachable contract target: It contends the Renewal Clause is unconscionable. And the sole reason that Lake Forest offers to that end is that the Renewal Clause gives American the option to "perpetually renew the Agreement" (P.Mem. 4). Lake Forest offers—and this Court also finds—no authority for the proposition that a perpetual contract is unconscionable on its face. As already discussed at length, *Davis*, 77 Ill.App.3d at 1014, 33 Ill.Dec. at 886, 397 N.E.2d at 219 unequivocally states that such agreements are lawful in Illinois.

P.Mem. 4 suggests that because Lake Forest has no "meaningful choice" to terminate the contract or change its terms that the Second Agreement is unconscionable. If that were the law, *every* contract would be unconscionable, for the very idea of a contract is to bind the parties to their voluntarily-entered-into agreement. Wholly contrary to Lake Forest's suggestion, a party's lack of such a "meaningful choice" to change or to wipe out contract obligations does not mean that the party is somehow given an opportunity to ignore them.

*In re Estate of Croake*, 218 Ill.App.3d 124, 127, 161 Ill.Dec. 209, 211, 578 N.E.2d 567, 569 (1st Dist. July 26, 1991) (citation omitted) explains the Illinois law of unconscionability:

> To the extent that defendant also suggests this agreement was unconscionable, we note that a contract will be treated as unconscionable when it is so one-sided that only one under delusion would make it and only one unfair and dishonest would accept it. An unconscionable contract is one where a party has no meaningful choice and the terms are unreasonably favorable to the other party.[17]

> However, "[a] duration term need not specify a date or period of time; it can identify some event which will terminate, even if it is not clear, ex ante, when that event will take place."

**16.** Moreover, the Second Agreement would also terminate at the end of the current term if American failed to renew the contract by the time prescribed in the Renewal Clause. That eventuality also specifies the duration of the Agreement. See *Schenley Affiliated Brands Corp. v. Mar–Salle, Inc.*, 703 F.Supp. 744, 747 (N.D.Ill.1989), quoting *H.L. Miller Machine Tools, Inc. v. Acroloc*, 679 F.Supp. 823, 825 (C.D.Ill.1988):

**17.** [Footnote by this Court] To the identical effect, see also *In re Marriage of Lee*, 135 Ill. App.3d 509, 514, 90 Ill.Dec. 245, 248, 481 N.E.2d 1045, 1048 (1st Dist.1985), quoting *Hume v. United States*, 132 U.S. 406, 410, 10 S.Ct. 134,

Furthermore, as *Reuben H. Donnelley Corp. v. Krasny Supply Co.*, No. 1–89–2660, 1991 WL 111254, at *3, 1991 Ill.App. LEXIS 1083, at *6 (1st Dist. June 25, 1991) (citations omitted) states:

> Where the issue of unconscionability is alleged, the party alleging the unconscionability has the burden at trial to produce sufficient evidence of unconscionability.

But Lake Forest has offered no evidence whatever to show that the Second Agreement is unconscionable. Indeed, all the facts support American. For example, Lake Forest negotiated the Second Agreement to make changes (plainly provisions that it viewed as favorable) to the terms of the First Agreement. It later agreed in the Amendment to modifications to the Second Agreement. Nothing indicates that it lacked meaningful choice in bargaining for the terms of the Second Agreement—though to be sure no contracting party is obligated to agree to further changes in a contract just because it has done so once before. In addition, the Renewal Clause that Lake Forest now claims is unconscionable was reviewed by the Lake Forest Board both before it approved the First Agreement and again before the Second Agreement, and the Board voiced no objection to the Renewal Clause at either time (Hodgkins Dep. 26).

Lake Forest simply fails to offer any proof that the Agreement is so one-sided or oppressive as to make it unconscionable. Lake Forest's claim of unconscionability seems to be based on the notion that if Lake Forest now perceives the bargain as a bad deal or "unfair" (Hodgkins Dep. 24), then it is unconscionable. But as *Reuben H. Donnelley, id.* 1991 WL 111254, at *3, 1991 Ill.App. LEXIS 1083, at *8 states:

> [A] court will not set aside the contract merely because that agreement later turns out to be a bad bargain for one of the parties.

And as *In re Estate of Croake*, 218 Ill. App.3d at 126, 161 Ill.Dec. at 211, 578 N.E.2d at 569 (citations omitted) explains:

> A court will not set aside a contract merely because the agreement is not a wise one from the standpoint of the party seeking rescission. Nor will a court set aside a contract merely because it is unfair.

Nothing in the Second Agreement reveals the slightest hint of unconscionability. In fact the terms can hardly be described even as unfair, much less unconscionable. Second Agreement ¶ 2(b)–(d) guarantees a minimum enrollment of American students, and American's fee to Lake Forest for each student enrolled is tied to tuition. Thus even if American chooses to renew the Agreement for many years to come, increases in Lake Forest's tuition will guarantee that American's fee to Lake Forest will be adjusted in its favor.[18] Contrast that with the situation of the lessor in a 99–year (or 999–year) lease providing for a fixed rental with *no* adjustment for the value of money—an agreement enforceable under Illinois law (see n. 14).

In short, the Second Agreement is indisputably not (*In re Estate of Croake, id.* at 127, 161 Ill.Dec. at 211, 578 N.E.2d at 569):

> so one-sided that only one under delusion would make it and only one unfair and dishonest would accept it.

Merely because Lake Forest may *now* feel that the Second Agreement is not in its best interest, that is not at all a reason to find the arm's length contract unconscionable.

---

136, 33 L.Ed. 393 (1889) (other citation omitted):

> The contract must be totally one-sided or oppressive, one "which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept on the other."

**18.** On May 17, 1991 Lake Forest adjusted the fees payable by American for the 1991–92 school year upward by a letter giving "formal notice" to American (Stanley Pickett Aff. Ex A). In accordance with Second Agreement ¶ 2(b)(1) (quoted earlier), Lake Forest's letter specified its new higher charges to its own students (its new "fee structure") and announced that American's students would have to pay 48% of that amount. And it referred to "the agreement between us dated November 21, 1983 as extended."

### Conclusion

It is incontestable that the Renewal Clause unambiguously provides American with the "option to renew" the Second Agreement "for successive terms of three (3) years each." It may renew that Agreement repeatedly, and as many times as it desires, by complying with the notice requirements found in that same Clause. Because there are thus no genuine issues of fact as to Lake Forest's claim for a declaratory judgment, American is entitled to judgment as a matter of law on that claim. This action is set for a status hearing at 9 a.m. October 3, 1991 to discuss further proceedings in the case in light of this opinion.