MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:
This action arises from a fee dispute between plaintiff Norfolk and Western Railway Company (“Norfolk”) and defendant Illinois Central Railroad Company (“IC”). Earlier, we granted IC leave to file a third party complaint against SPCSL Corporation (“SPCSL”). Presently before us is IC’s motion for summary judgment against Norfolk and Norfolk’s motion to strike. For the following reasons, we grant in part and deny in part defendant’s motion for summary judgment and deny plaintiffs motion to strike.
I. Factual Background
This case involves a dispute about the fees Norfolk may properly charge for the switching of acid-filled railroad cars owned by IC to and from the Wood River Manufacturing Complex (“Wood River”). Shell Oil Compa *1232 ny (“Shell”) has owned and operated the Wood River oil refinery since the 1920’s. Wood River is geographically divided into the north property, which houses a tank farm, and the south property, or main plant, where most of the refining takes place. Shell ships and receives materials and products via rail lines running through the south property.
A. The Joint Engine Agreement
Not surprisingly, coordination of rail traffic among the various carriers using the lines on Shell’s property can become a complicated enterprise. Accordingly, in 1971, three railroads having direct access to Wood River negotiated a Joint Engine Agreement (“Agreement”). The Illinois Terminal Railroad Company (“Terminal”) (which became Norfolk), the Gulf, Mobile and Ohio Railroad Company (which became IC), and the Trustees of the Penn-Central Transportation Company (which became Conrail), agreed that Terminal would provide switching services at Shell’s Wood River refinery.[1] The Agreement provided that “[t]he joint services to be performed by Terminal [Norfolk] hereunder shall be for [Shell’s] main plant located south of Terminal’s [Norfolk] main line in Wood River, Illinois.” Agreement at ¶2. By its own terms, the Agreement was assignable and could be terminated by any one party upon ninety days written notice.
In fact, in 1987, IC sold miles of trackage to the Chicago, Missouri, and Western Railway Company (“CM & W”), including tracks around the Wood River facility. Consequently, IC assigned its interest in the Agreement to CM & W. When CM & W went bankrupt, it sold the trackage and assigned the Agreement to SPCSL.
After IC assigned its interest in the Agreement, it continued to send cars to Shell’s oil refinery. In order to do so, it contracted with CM & W and then SPCSL to “handle” its cars. According to IC, it paid the rail companies a flat rate of $100 to carry its empty ears and $165 to carry its loaded cars to and from Wood River. IC asserts that the rate covered the switching fees charged by Norfolk under the Agreement.[2] Regardless of the terms of the contracts, it is undisputed that CM & W did present IC’s cars to Norfolk for switching prior to the building of the acid transfer facility, and that Norfolk did, in fact, switch the ears and bill CM & W.[3]
B. The Acid Transfer Facility
Sulphuric acid is required in the manufacture of high grade gasoline. Until recently, Shell manufactured, processed and regenerated its own sulphuric acid, purchasing additional supplies as needed. However, Shell desired a steadier, more reliable, supply stream. Thus, in 1988, Shell contracted with Rhone-Poulenc Basic Chemicals Company (“Rhone-Poulenc”), formerly a division of Stauffer Chemical Company, to build an acid transfer facility for Shell and to arrange for a constant supply of sulphuric acid for Shell’s use. Rhone-Poulenc was to ship regenerated acid from its regeneration plant in Hammond, Indiana via rail to Wood River. Once the acid arrived, Rhone-Poulenc would use the newly-constructed facility to unload the new acid and load the old acid for transport to Hammond for regeneration.
Rhone-Poulenc built the facility, at Shell’s expense, around an existing rail spur (the “coke-spur”) on the south property.[4] However, in addition to using the coke-spur, Rhone-Poulenc laid some additional tracks branching off from the existing lines. Upon completion of the facility in 1989, RhonePoulenc sought bids for the transportation of acid between Wood River and Hammond. Rhone-Poulenc chose among various companies, including Norfolk, and ultimately con *1233 tracted with IC and the Indiana Harbor Belt Railroad Company to move the acid loads to and from Wood River.
C. Tariff 8315-E, Supplement 108, Item 6495-A
On October 20,1989 — soon after shipments to the acid facility began — Norfolk announced a supplement to its Switching Tariff No. 8315-E. Supplement 108 amended Item 6495-A to list Rhone-Poulenc as a separate industry in Wood River (also known as Roxana, Illinois). By identifying Rhone-Poulenc as a separate and new industry, Supplement 108 purported to make traffic to and from the facility subject to Tariff No. 8315-E, rather than the Joint Engine Agreement otherwise covering switches for Shell’s south property.[5]
Upon learning of the facility’s classification, agents of Rhone-Poulenc, Shell, and IC contacted Norfolk and informed it that Rhone-Poulenc was simply the constructor and operator of the facility, while Shell was the owner. In response, Norfolk maintained that even if Shell owned the facility, the Agreement did not pertain to new industries, or to satellite facilities, additions, or annexes.[6]
Not long thereafter, Norfolk notified the other parties that it was terminating the Agreement. In fact, the Agreement dissolved on October 15, 1990.
II. Discussion
IC seeks summary judgment on both Counts I and II of the complaint. Summary judgment is appropriate if no genuine question of fact remains as to (1) whether the switching of rail cars to and from the Wood River acid transfer facility is properly subject to the Joint Engine Agreement (Count I), and (2) if the Agreement does control, whether IC, not SPCSL, is liable under the Agreement for payments due (Count II).
A. Summary Judgment on Count I
Whether Tariff 8315-E or the Agreement governs the switching of IC’s rail cars to and from Wood River depends upon the resolution of a multiplicity of factual and legal issues: (1) does Shell or Rhone-Poulenc own the acid transfer facility at Wood River, (2) is the facility a part of the “main plant” within the meaning of the Joint Engine Agreement, (3) if the facility is part of the main plant, does it nonetheless fall outside of the Joint Engine Agreement by virtue of its new construction, and finally, (4) even if the Joint Engine Agreement applies to traffic to and from the new facility, does it apply to IC cars tendered by CM & W or SPCSL now that IC has assigned its interest in the Agreement? Because a material dispute exists with respect to at least one of these issues, summary judgment must be denied.
There is no dispute that the Agreement governed CM & W’s and SPCSL’s switching to and from Shell’s main plant on the south property of the Wood River refinery. The Agreement language provides that “[t]he joint services to be performed by Terminal [Norfolk] hereunder shall be for [Shell’s] main plant located south of Terminal’s [Norfolk’s] main line in Wood River, Illinois.” Agreement at ¶ 2. This is where the harmony ends.
IC claims that the new facility is unquestionably a part of Shell’s main plant, and is thus covered under the Agreement. Norfolk, however, asserts that it is not a part of the main plant, within the meaning of the contract, because, among other reasons, its construction post-dates the Agreement. IC responds that nothing in the Agreement limits its effect to facilities in existence in 1971. While both parties claim that the contract unambiguously supports their position, given the absence of explanatory language in the contract, it is open to more than one reasonable interpretation. Accordingly, on its face, the contract does not permit summary judgment for IC.
If a contract is ambiguous, courts may look to extrinsic evidence to discern the meaning of the contract and the intent of the *1234 parties. Lumpkin v. Envirodyne Industries, Inc., 933 F.2d 449, 456 (7th Cir.1991), cert. denied, — U.S. -, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). Here, however, no meaningful evidence has been offered to illuminate the parties’ intent when they signed the Agreement. Accordingly, the question of whether the signatories meant the Agreement to apply to new structures remains open. This factual issue alone precludes summary judgment. Thus, we deny summary judgment on Count I.[7]
B. Summary Judgment on Count II
At the outset, we note that Norfolk has failed to respond to IC’s motion for summary judgment on Count II, and thus has abandoned this claim. In any event, summary judgment appears to be appropriate on the merits.
In Count II, Norfolk seeks to recover from IC for any fees which might be due under the Agreement. IC claims that if the Agreement applies to the switching at issue, those fees are due from CM & W or SPCSL, not from IC, since IC had long since assigned its interest in the Agreement at the time of the disputed switchings. We agree.
Bear in mind, that Count II only comes into play if Norfolk loses Count I, and the Agreement is found to have governed the switchings at issue. The question, then, is, if the Agreement properly applies to SPCSL’s presentment of IC’s cars for switching to the acid transfer facility, who is liable to Norfolk for the switching fees? To answer this question, we must first understand under what conditions the Agreement applies.
Based on the record, it appears that the Agreement applies to the disputed switching only if a party to the Agreement, such as SPCSL, may present a non-party’s cars to Norfolk for switching at contract rates just as it would present its own ears for switching. Unquestionably, SPCSL has the right to haul its own cars along its Wood River trackage. However, under the Agreement and to regulate traffic, switching is to be performed by Norfolk. Similarly, when SPCSL contracts to handle another railroad’s cars, it has the right to haul the cars along its Wood River trackage, but, under the Agreement, it presents them to Norfolk for switching, in the same manner and for the same rate that it would present its own cars.
In this scenario, there is no question that Norfolk is performing its switching services under the terms of the Agreement and for the benefit of a party to the Agreement, namely SPCSL. Indeed, if Norfolk were performing the switching services for IC directly, the Agreement could not apply, since all parties agree that IC no longer has any rights or interests in the Agreement. Since the switching is being performed for a party to the Agreement (SPCSL) under the terms of the Agreement, SPCSL, not IC, is liable for any fees due under the Agreement. Accordingly, we grant summary judgment in favor of IC on Count II.[8]
C. Motion to Strike
Because, even admitting all of IC’s tendered affidavits and documents, we find that summary judgment is inappropriate on Count I, we need not address Norfolk’s motion to strike. Accordingly, we deny it as moot.
III. Conclusion
For the foregoing reasons, we deny defendant’s motion for summary judgment on Count I of the complaint, grant its motion for summary judgment on Count II and deny plaintiffs motion to strike. It is so ordered.

. As the switch carrier, Terminal, and then Norfolk, was responsible for moving rail cars of the other railroads in and out of Wood River from local rail yards.

. Norfolk disputes IC's claim that IC’s contracts with CM & W and SPCSL required the carriers to pay any switching costs.

. Norfolk maintains, however, that its billing was the result of poor information regarding the ownership of the cars being switched on behalf of CM & W, and further asserts that it chose not to invest energy into determining the ownership of each car presented by CM & W, because CM & W's total traffic amounted to only a small percentage of Norfolk's total switching.

. The parties dispute whether the facility is located within the main plant, or outside its boundaries.

. The tariff, of course, was significantly higher than the fees provided for in the Agreement.

. Norfolk has moved to strike letters submitted by IC detailing this correspondence. Because we deny Norfolk's motion, and for the sake of clarity, we include the substance of the correspondence in this background.

. This does not mean that Norfolk has a particularly strong case. It does not. In light of this reality, it behooves the parties to attempt to settle this matter.

. Our grant of summary judgment on Count II obviates the need for IC’s third party complaint against SPCSL. Accordingly, we dismiss IC’s third party action.